**VIDEO INTERNATIONAL PRODUC-TION, INC., Plaintiff-Appellant, Cross-Appellee,**

v.

**WARNER-AMEX CABLE COMMUNI-CATIONS, INC., et al., Defendants-Appellees,**

**The City of Dallas, Defendant-Appellee, Cross-Appellant.**

No. 87-1572.

United States Court of Appeals, Fifth Circuit.

Oct. 31, 1988.

Edwin J. Hughes, Brian E. Butler, Kristine A. Euclide, Madison, Wis., for Video Intern. Production, Inc.

Grant S. Lewis, Richard M. Berman, Stuart S. Mermelstein, Charles C. Platt, New York City, Orrin Harrison, III, David P. Blanke, Gary Ray Powell, Dallas, Tex., for Warner–Amex Cable Communications, Inc.

Paul K. Pearce, Jr., Niki Frank Stokols, Asst. City Attys., Dallas, Tex., for the City of Dallas.

Before GOLDBERG, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Video International Productions, Inc. ("VIP"), a nonfranchised cable television company in Dallas, Texas, sued the City of Dallas ("the City") and Warner–Amex Cable Communications, Inc. ("WAX"), the sole franchised cable television company in Dallas, for attempting to put VIP out of business, primarily through the use of zoning ordinances. VIP argued three theories before the district court: antitrust and civil rights violations, and tortious interference

with a contract to sell VIP. The jury found liability under all three theories, and awarded VIP zero damages for its antitrust claim; $200,000 compensatory and $2.5 million punitive damages for its civil rights claim; and $1.245 million actual and $500,000 punitive damages for the tortious interference with contract claim. The district court granted judgment n.o.v. with regard to all claims against WAX and the tortious interference claim against the City. VIP appeals the judgment n.o.v., and also challenges the jury's zero damage award for the antitrust claim. The City cross-appeals, challenging the jury's verdict on the civil rights claim. The parties also dispute myriad smaller issues, such as pre- and postjudgment interest and attorneys' fees.

We affirm most of the judgment of the district court as relates to liability, but remand for a new trial on damages because we are unable to discern a reasonable explanation for the jury's wide-ranging verdicts under the three claims, especially after the major portion of damages under the tortious interference claim has been invalidated.

I

As we review the district court's decision to overturn a portion of the jury's verdict and the City's challenge to the remainder of that verdict, we examine the facts in the light most favorable to VIP and the jury's verdict.

VIP, a cable television business formed to supply cable services to apartment complexes in north Dallas, began operating in August 1979. VIP installed satellite dish antennae (earth stations) on the premises of various apartment complexes and, through underground cables, transmitted the satellite signals received by the satellite dishes to individual apartments. Each satellite dish served the host complex as well as neighboring but separately owned apartment complexes. The cables crossed private property lines but none of VIP's systems utilized City property or public rights of way. Because VIP operated entirely on private property, it did not obtain a cable television franchise from the City.

VIP built five separate cable television systems, each with its own satellite dish, which served 28 apartment complexes and approximately 2,000 subscribers and had the potential to reach 6,000 subscribers.

In October 1980, VIP applied to the Federal Communications Commission ("FCC") for a permit to construct a cable television relay service ("CARS") station, which the FCC granted. The CARS facility would enable VIP to link its several cable television systems to transmit locally produced programs and to increase substantially its ability to establish additional cable systems in apartment complexes.

At approximately the same time that VIP had commenced its operations, the City began negotiations concerning a cable television franchise in the City. In October 1979 the City voted to franchise one cable operator for the entire city, and the City council, on November 5, 1980, awarded the franchise to WAX. WAX was given the right to operate the cable television network within the City, and in turn the City was to receive a five percent per annum franchise fee. The franchise is essentially the right to use public streets and rights-of-way for equipment installation.

The franchise agreement which the City reached with WAX contained a provision ("Section 7") that stated: "No CATV system shall be allowed to occupy or use the streets of the city or be allowed to operate within the City without a CATV franchise." The franchise agreement defined "CATV system" as:

> a system of antennas, cables, wires, lines, towers, waveguides, or other conductors, converters, equipment or facilities, designed and constructed for the purpose of producing, receiving, transmitting, amplifying and distributing, audio, video and other forms of electronic or electrical signals, located in the City. *This definition shall not include any facility that serves or will serve only subscribers in one or more multiple unit dwellings under common ownership, control or management, and does not use City rights-of-way.*

Section 1.b (emphasis added). Pursuant to these provisions, building permits that the City issued to nonfranchised cable companies subsequent to reaching the franchise agreement contained restrictions which earlier building permits had not contained. Silver Screen, a competitor of VIP, obtained a building permit two days after the adoption of the franchise agreement which stated that the antennae could not serve outside the apartment complex where it was being installed, and that Silver Screen could not charge the tenants it served without obtaining a City franchise. Afterwards, building permits issued to VIP contained similar restrictions, or such restrictions were written onto approved blueprints.

Silver Screen challenged the City's ability to impose such restrictions on cable companies that did not have a franchise. At a public hearing before the City Board of Adjustment on February 24, 1981, Silver Screen's attorney argued that the City could not require a franchise if the system did not use or cross public streets or rights-of-way. The City's chief zoning inspector testified: "We [the City] feel that a corporation coming in and making these installations is a commercial enterprise and would constitute a commercial business in an MF–1 zoning district." Silver Screen, however, wished only to relieve itself of the restriction against charging for its services; its system apparently did not cross private property lines.

At its March meeting, the City announced that the Building Inspector's office had abandoned its claim that Silver Screen could not charge for its services. Thus, Silver Screen obtained all the relief it sought. The chief zoning inspector persisted in his position, however, and was given approval of the interpretation of the zoning code that cable services could not cross public rights-of-way *or* private property lines. This interpretation was apparently based upon the categorization of cable facilities as commercial, which would then require them to fit within the "accessory use" provision of the Dallas City Code to be allowed in a residential area. An accessory use is a "use customarily incident to a main use." One of the requirements of the accessory use provision is that the thing in issue must be located on the same lot as the main use (in this case, the apartment complex it serves), and must not be across a street or alley from the main use. Dallas Development Code Sec. 51–4.217(a).

A month after the Board of Adjustment adopted this interpretation of the zoning code, Silver Screen's attorney proposed a modification to the accessory use provision to allow nonfranchised cable systems that did not cross public streets to serve separately owned apartment complexes.

There is evidence in the record of numerous telephone calls and meetings among City officials and with representatives of WAX prior to the May 18 hearing on the proposed zoning amendment. WAX representatives informed the City that they believed the proposed amendment would amend Section 7 of the franchise agreement. At the hearing before the Zoning Ordinance Advisory Committee ("ZOAC"), which makes recommendations on proposed zoning amendments, both the City official in charge of administering the franchise and an attorney from WAX testified against the proposed amendment. The WAX attorney argued that the proposed amendment would violate WAX's understanding with the City. He also noted that nonfranchised systems did not pay the City the five-percent fee as WAX did, and that they were not subject to WAX's programming restrictions. The City official testified that the amendment would allow commercial ventures in residential zones, and that nonfranchised operators would not be subject to the duties placed on the franchisee. ZOAC unanimously decided to recommend against adopting the proposed amendment.

During this time, WAX also began to compile a file on VIP's north Dallas cable business. WAX determined that VIP had a sophisticated system with the CARS license and its subscription list was limited only by the capital to expand the system. After this determination, WAX executives obtained a copy of VIP's CARS license from the FCC and then met with City officials

concerning VIP. WAX executives asked City officials to investigate VIP's zoning violations further. In July an article appeared in Cablevision Magazine regarding VIP's business and its threat to WAX. After reading the article, a WAX executive called City officials and discussed VIP's business. WAX then issued a memorandum to City officials regarding possible right-of-way violations that VIP had committed. The memo concluded "a meeting has been scheduled for 10:00 AM on July 31 in the city attorney's conference room to discuss the implications and possible courses of action to take with respect to the operation of VIP in Dallas." VIP was not invited to any of the meetings. During the following weeks, WAX and the City contacted each other several times concerning VIP's operations and possible zoning violations. On August 24 another article concerning VIP appeared in MultiChannel News and indicated that a long-time WAX competitor, the Campbell Family Partnership, was attempting to buy VIP's business. The article included a statement by one City official that "Warner–Amex and our office have been discussing [VIP] for some time." On September 2 the City council, upon a request by WAX, granted WAX permission to provide cable service to north Dallas, three years ahead of WAX's franchise schedule. On September 3, an executive with WAX informed its national office that the City had delivered zoning violations to twenty-three apartment complexes served by VIP. On September 4, WAX filed a petition with the FCC in opposition to VIP's request to transfer its CARS license to the Campbell Family Partnership which was attempting to buy VIP at the time. In WAX's petition, it noted that the City had issued zoning violations to VIP. The sale of VIP stock to the Campbells was set to close on September 16 and the City actually served the violation notices on September 11. The apartment owners and VIP were given fifteen days to remove VIP's cables. The basis upon which the City relied for citing VIP was section 51–4.217 of the City code, which required that accessory uses be located on the same lot as the main use. The

City interpreted this to mean cables could not cross private property lines. VIP, in a letter dated September 14, informed the City that the notices of violations were illegal and demanded that they be withdrawn by September 15. It also informed the City that the company's business was scheduled to be sold on September 16 and that the City was impairing VIP's ability to close the sale with the Campbell Family Partnership. On September 15, the Campbells' attorney informed VIP that they could not purchase VIP's business because of the City's zoning citations. VIP subsequently shut down its operating system for a few days. VIP shortly re-started its system, and then began negotiating with the Campbells again and entered into an agreement to sell all of its assets to the Campbells in return for the Campbells assuming VIP's liabilities. The difference between the price the Campbells paid for VIP's assets in October and the price that they had agreed to pay for the corporation's stock in August was $1.245 million.

After taking over VIP, the Campbells reactivated the system and the City filed suit against Campbell. On June 8, 1982, the City filed a motion for a nonsuit requesting that the case be dismissed because they no longer wished to prosecute the Campbells. That motion was granted and the City subsequently amended Section 7 of the franchise agreement to remove the provision that no unfranchised cable system would be permitted to operate in the City.

## II

VIP sued the City and WAX for alleged antitrust and section 1983 violations, and tortious interference with the contract between VIP and Campbell Family Partnership. At trial, the jury found for VIP on all three claims and awarded damages as follows: $0 for antitrust violations; $200,000 compensatory damages and $2.5 million in punitive damages for section 1983 violations; and $1.245 million in actual and $500,000 in punitive damages for tortious interference with contract for potential plaintiffs Frank Parrish and Jack Weiss.

(Parrish and Weiss did not join the suit as plaintiffs and the defendants objected to the award of damages for tortious interference with contract because VIP was not a party to the contract in question. VIP then sought to add Parrish and Weiss as parties in this lawsuit.)

WAX and the City then moved for judgment notwithstanding the verdict, and VIP moved for judgment on the verdict and for a new trial on the issue of damages for the violations of the antitrust laws. The district court found that WAX's actions were protected by the first amendment right to petition the government (*Noerr–Pennington* immunity), that there was sufficient evidence to support the jury's finding that the City had violated VIP's first amendment right to free speech (section 1983), and that the City had not tortiously interfered with VIP's contract because it did not have the requisite knowledge of the contract. The district court did not directly address the City's antitrust liability, probably because of the zero damage award under that theory. In its discussion of WAX's liability and the *Noerr–Pennington* doctrine, however, the district court reasoned that there was insufficient evidence to find an illegal conspiracy between WAX and the City. Thus the court held that VIP was entitled to recover only $200,000 of actual damages from the City, together with reasonable attorney's fees, expenses and costs of $378,194.90 under its section 1983 action. The court denied VIP all other relief.

VIP filed this appeal, arguing that WAX's and the City's actions fell within an exception to the *Noerr–Pennington* doctrine, and that the jury's verdict against WAX should stand; that the trial court erred in concluding that there was insufficient evidence that the City had knowledge of the contract to uphold the jury's verdict on tortious interference with a contract; that the damages the jury awarded were not duplicative and that VIP is entitled to a new trial on the issue of antitrust damages; and that VIP is entitled to prejudgment interest.

The City cross-appealed, arguing that the district court lacked jurisdiction; that the City had not deprived VIP of any constitutional right to support a section 1983 claim; that the contract interference claim must fail because it was instituted by the wrong party; that a city cannot be liable for common-law intentional tort or punitive damages; that VIP had not proved various elements of its contract interference claim; that VIP had not suffered damages and had, in any event, failed to mitigate damages; that VIP was not entitled to attorneys' fees; that *Noerr–Pennington* protected the City as well as WAX; and that the City was immune from damages under the Local Government Antitrust Act of 1984.

### III

To aid the analysis in this case, we think it helpful to lay out the basic scenario that VIP claims underlay the actions of WAX and the City:

WAX and the City included section 7 in the franchise agreement in order to exclude other cable companies from operating in Dallas without a franchise. This arrangement benefitted both parties since by refusing other franchises, WAX would have exclusive access to Dallas customers, and the City would receive a five percent annual fee on all of WAX's business that it would not receive on the business of unfranchised cable companies.

■ At some stage, it became clear that the City did not have authority to require a franchise of cable companies that did not use public streets or rights-of-way to string their cables. It is not clear when the City and WAX realized this, but on appeal they concede this fact. It is the crossing of public ways that gives the City the right to require a franchise. *West Texas Utilities Co. v. City of Baird*, 286 S.W.2d 185 (Tex. Civ.App.—Eastland 1956).

According to VIP, when WAX and the City realized that they could not require a franchise of cable companies whose lines did not cross public streets, they began searching for another way to accomplish the same goal. Between WAX and the

City, they devised a theory under the zoning law that satellite dishes were commercial and thus had to fit within the "accessory use" provision of the zoning code. The dishes, therefore, could serve only those complexes where ·they were installed. VIP's scenario requires the inference that this categorization of satellite dishes as "commercial" was a means to accomplish the illegal goal in the franchise agreement. As we analyze the individual issues in this case, we will consider both whether the jury had sufficient evidence to support VIP's scenario and whether this scenario, if proved, fulfills the requirements of the various claims.

### A.

We turn first to discuss the applicability in this case of the *Noerr–Pennington* doctrine, and the exceptions to that doctrine. WAX argues and the district court found that this doctrine protects WAX's activities from liability. VIP responds that the "co-conspirator exception" to the doctrine applies to WAX, and that the doctrine therefore does not shield WAX from antitrust and other liability.

■ The *Noerr–Pennington* doctrine and the exceptions to it grew from two Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent. Thus, railroads that embark on advertising campaigns designed to convince the legislatures to pass laws detrimental to the trucking industry are not subject to antitrust liability for those actions even though their ultimate goal is to drive truckers out of business and limit competition. Similarly, "petitions" made to the executive or judicial branches of government, e.g., in the form of administrative or legal proceedings, are exempt from antitrust liability even though the parties seek ultimately to destroy their competitors through these actions.

Possible exceptions to this doctrine were first noted in *Noerr* and *Pennington* and have since developed more fully. Our reading of both the law in general and the briefs in this case indicates that there is a substantial amount of confusion over the extent of and distinction between these exceptions. We will thus explain our interpretation of these exceptions based upon their purposes.

Much of the confusion surrounding the doctrine and its exceptions arises from the lack of a definition of, and distinction between, two separate exceptions: the "sham" exception and the "co-conspirator" exception. These two separate ideas are often confusingly interchanged in the case law, and therefore also in the parties' briefs. Nonetheless, we discern these two ideas as separate and deriving from slightly different policy objectives.

■ The "sham" exception comes into play when the party petitioning the government is not at all serious about the object of that petition, but engages in the petitioning activity merely to inconvenience its competitor. Thus, the sham exception is said to apply when one party has begun litigation not to win that litigation, but rather to force its competitor to waste time and money in defending itself. Similarly, a party that "petitions" the government by engaging in administrative processes only to preclude or delay its competitor's access to those processes may be liable for antitrust damages under the "sham" exception. There is much debate about how a court can tell when a petition is not genuine. We need not busy ourselves with this problem, however, since it is apparent that, despite frequent referral to it by the briefs and the courts below, the "sham" exception does not apply in this case. WAX petitioned City officials to obtain and/or maintain a certain interpretation of the zoning code. WAX's intent was to obtain that interpretation, not to prevent VIP's gaining access to government or waste VIP's resources in fighting the interpretation. This finding is

supported by the fact that WAX succeeded in attaining its goal of a zoning code interpretation that prevented cables from crossing private property lines. Although on its own such success might not be sufficient to prove that the petitioning activity is not a sham, *see In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir.1987) (see both majority and concurring opinions), neither party seriously contends that WAX did not seek the end for which it petitioned.

■ Rather, VIP asserts that the "co-conspirator" exception to the *Noerr–Pennington* doctrine may apply even when the petitioner actually seeks the object of its petition. We agree that although sometimes a sham petition may coincide in a case with an illegal conspiracy with government officials, it need not always do so, and it is the illegal conspiracy that is the essence of this second exception to the *Noerr–Pennington* doctrine. We must thus examine whether such an illegal conspiracy existed between WAX and City officials sufficient to activate the co-conspirator exception.

Our reading of the cases involving the "co-conspirator" exception demonstrates that this exception has been applied in cases where a government official or body has been influenced by the petitioner through some corrupt means. *See, e.g., Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555 (5th Cir.1984). Although WAX argues that the exception will not apply unless WAX used coercion or bribery to obtain its end, we do not believe the exception is so restricted. At the same time, however, we do find that the cases indicate that the official with whom the petitioner conspires must, at a minimum, have had some selfish or otherwise corrupt motive in siding with the petitioner to result in an illegal conspiracy sufficient to activate the co-conspirator exception.

The case before us presents a new twist. In this case, the officials may have perverted the zoning regulations for a purpose other than that for which it was intended. It was not in any way a personal or selfish purpose, however; rather, it was to further the best interests of the City. That is, the

City shared with WAX a desire to reduce the business of other cable companies and increase that of WAX. This mutual goal arose because the City received a five percent franchise fee from WAX that it did not receive from the other companies. The City thus had an incentive to seek out and enforce laws against other cable companies that would result in decreasing their share of the cable business and increasing WAX's share.

We will consider the propriety of the City's enforcement later in this opinion; however, we think the propriety of the City's motives is irrelevant in evaluating WAX's liability for encouraging the City to enforce its zoning code.

■ The point of the *Noerr–Pennington* doctrine is to protect private parties when they petition the government for laws or interpretations of its existing laws even though those private parties are pursuing their goals with anticompetitive intent. To hold WAX liable because the City itself had anticompetitive intent for its own economic reasons would place too great a burden on WAX's first amendment right to petition the government. In such a case, WAX would not only have to discern the City's true motives before petitioning for its zoning interpretation, it would have to withhold its petition altogether if it determined that the City might act on it for anticompetitive reasons. Otherwise, the submission of the petition alone might subject WAX to antitrust liability if it were ultimately determined that the City acted for the anticompetitive reasons it shared with WAX and that it had no zoning interest upon which to base its enforcement. The fact that in this case the City may have shared WAX's anticompetitive intent does not remove the protection of the *Noerr–Pennington* doctrine from WAX's lobbying activities.

■ VIP has not demonstrated any evidence of personal corruption or other venal motive on the part of the City officials who supported WAX's petitions. WAX cannot be liable, therefore, for exercising its first amendment right to petition the govern-

ment. The district court correctly excused WAX from antitrust liability in this case.

Although the *Noerr–Pennington* doctrine initially arose in the antitrust field, other circuits have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws, including section 1983 and common-law tortious interference with contractual relations. *See, e.g., Evers v. County of Custer*, 745 F.2d 1196, 1204 (9th Cir.1984); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614 (8th Cir.1980), and cases cited therein. We find it easy to agree that the same rationale under antitrust law that supports WAX's petitions to the City also serves to protect WAX from the tort claim. There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust.

The section 1983 claim presents more difficulty, although we ultimately arrive at the same result. The difficulty arises from the fact that section 1983 itself protects constitutional rights, so our reasoning must involve a more careful balancing of interests. In order for a private party to be liable under section 1983, it must have acted under color of state law. WAX's first amendment petitioning of the City does not constitute action under color of state law unless WAX acted as a co-conspirator with the City in violating Video's constitutional rights. *Dennis v. Sparks*, 449 U.S. 24, 26, 101 S.Ct. 183, 185, 66 L.Ed.2d 185 (1980). It is true that the evidence here supports the skeletal elements of a conspiracy between the City and WAX, that is, an agreement to accomplish an alleged illegal object and acts in furtherance of that object. But the Supreme Court noted (in the context of petitioning a court for an injunction), "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge." *Id.* at 28, 101 S.Ct. at 186. The element in *Dennis* that converted the private actors into co-conspirators acting under color of law was that they engaged in a *"corrupt*

conspiracy involving bribery of a judge." *Id.* at 28, 101 S.Ct. at 186 (emphasis added). As we have already concluded, there is insufficient evidence here to support the theory of a corrupt conspiracy that would deny WAX the protection of the *Noerr–Pennington* doctrine. We think that if *Noerr–Pennington* is to have its intended effect at all, an analysis of whether the petitioner is a co-conspirator under section 1983 must parallel the co-conspirator exception with *Noerr–Pennington*. This conclusion is fully consistent and consonant with the language of the Supreme Court in *Dennis* ("private parties who *corruptly conspire* with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983 as it has been construed in our prior cases"). *Id.* at 29, 101 S.Ct. at 187 (emphasis added). Otherwise, first amendment petitioning could be challenged in the section 1983 context as a denial of equal protection, a taking of property without just compensation, a first amendment violation, or other constitutional claim, thus vitiating *Noerr–Pennington* protection. Further, we believe that the equation of section 1983 state action with the *Noerr–Pennington* co-conspirator exception sufficiently guards those constitutional rights that section 1983 serves to protect.

Thus, we hold that any behavior by a private party that is protected from antitrust liability by the *Noerr–Pennington* doctrine is also outside the scope of section 1983 liability. To hold otherwise would effectively cast a cloud over a broad range of causes that are brought before courts, legislatures, or governmental agencies. For these reasons, the district court correctly excused WAX from section 1983 liability in this case.

### B.

We next address whether the City can be held liable for tortious interference with a contract under Texas common law. The contract in question is that between the shareholders of VIP and Campbell Family Partnership to sell VIP. The jury found both the City and WAX liable for

$1.245 million compensatory and $500,000 punitive damages. The district court overturned the jury's verdict in regard to WAX's liability, because it was again covered by the *Noerr–Pennington* doctrine. As to the City, the district court found there was insufficient evidence to show that the City had the requisite knowledge of the existence of the contract with which it had allegedly interfered. We agree with the district court that WAX is protected by the *Noerr–Pennington* doctrine. Although we are less certain that the jury lacked sufficient evidence upon which to find that the City had knowledge of the contract, we do not reach this issue since we find that the City's sovereign immunity prevents VIP's claim of tortious interference with a contract.

 Under the Texas Tort Claims Act (Tex.Civ.Prac. & Rem.Code §§ 101.001, *et seq.* (Vernons 1986)), the City is not liable for intentional torts, and contract interference is such an intentional tort. *Tippett v. Hart,* 497 S.W.2d 606 (Tex.Civ.App.—Amarillo 1973, *writ ref'd n.r.e.* 501 S.W.2d 874 (Tex.1973). Furthermore, we need not address VIP's contention that the City failed to raise its immunity in the district court, since "[W]hen the judgment of a district court is correct, it may be affirmed for reasons not given by the court and not advanced to it." *Laird v. Shell Oil Co.,* 770 F.2d 508, 511 (5th Cir.1985).

VIP argues that the City does not have sovereign immunity when it is performing a proprietary rather than a governmental function. The law is settled that a city's enforcement of its zoning code is an exercise of its police powers, a governmental function. *City of West Lake Hills v. City of Austin,* 466 S.W.2d 722, 726 (Tex.1971); *City of Hutchins v. Prasifka,* 450 S.W.2d 829, 835 (Tex.1970); *Lombardo v. City of Dallas,* 124 Tex. 1, 73 S.W.2d 475 (1934).

VIP's complaint in this case arises from the City's enforcement of its zoning code, including sending out zoning violation notices which had the effect of impeding the expansion and continuation of VIP's business. These actions were clearly taken within the City's governmental-police power authority. VIP argues that the City was performing a proprietary function because of its relationship with WAX in the franchise agreement. First, however, it is clear that the actions of which VIP complains were taken pursuant to the City's zoning authority. Second, we do not think that a five percent franchise fee for a service rendered to the citizens by a private company places the government in a proprietary capacity even if the government were acting as administrator of the franchise in the actions of which VIP complains, which it was not.

## C.

### (1)

 VIP next contends that it is entitled to a new trial on the issue of antitrust damages. Although the jury found that the City and WAX were liable under the antitrust theory, they allotted zero damages to this claim. We have struggled to follow the Supreme Court's admonition to search for a view of the case that makes the jury's answers to special interrogatories consistent, *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962), but we can find no view that reconciles the jury's damage awards under the section 1983 and contractual-interference tort claims with the zero damage award under the antitrust claim.

VIP tried this case as one set of facts demonstrating a single injury for which the jury could find liability under any one or all of three theories. VIP argued that it was injured by an agreement between WAX and the City that led to the issuance of the zoning violations and affected the value of VIP's business, and that this set of facts demonstrated violations of antitrust, civil rights (equal protection, due process and free speech) and Texas tort laws. The case was not presented, tried, or argued as one in which discrete damages had been suffered under each claim. Although liability arguments under each theory may have been advanced on different parts of the evidence, it seems clear that damages under each theory rested on identical facts,

that is, the loss of business and customers because of the City's application of its zoning laws as reflected by VIP's loss in revenues and value between the first and second contracts of sale to the Campbells. Thus, one would expect the jury's respective damage awards to be virtually the same. The jury's lopsided apportionment of damages therefore makes us think it likely that the jury decided the total amount it wished to award and apportioned it *among* the theories, rather than awarding duplicative damages on each separate theory in approximately the same amount. We would be less concerned that the jury divided its total damage award inconsistently among the theories if the district court (and we) had not eliminated the damage award under the claim for tortious interference with contract. It was under that theory that the jury awarded VIP the major part of its damages, and now we have eliminated that portion of the award. Because we are most uncertain, and the parties offer little plausible explanation, why the jury allotted zero damages for antitrust violations and a major sum for contract interference when both theories are supported by the same set of facts, we think equity requires that VIP should have another chance before the jury to prove whether, under the remaining two theories, VIP is entitled to greater damages than it would receive with the tort claim eliminated and no remand. Furthermore, as we have indicated, damages under the section 1983 claim are based upon identical facts as the antitrust and contract-interference claims and yet the jury returned a verdict of only $200,000. Because we are remanding on damages based upon the confusing conflict among the various awards, we think it necessary to remand for damages on both remaining theories, that is, section 1983 and antitrust, to allow the new jury to write on a clean slate, and to avoid possible duplication and other confusion.

### (2)

 This holding, of course, is based upon the fact that the jury did find that WAX and the City were liable for antitrust and civil rights violations. As previously explained, however, WAX cannot be held liable under either issue. The City's arguments that *Noerr–Pennington* protects it from antitrust liability fail, however. There was sufficient evidence for the jury to determine that WAX and the City were engaged in anticompetitive activity in violation of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. In particular, the jury reasonably could have read the evidence to indicate that the City and WAX had agreed to restrain the competition posed by VIP and other similar companies and, in furtherance of this agreement, the City had manipulated the zoning ordinances to eliminate such competition. WAX, however, is protected by its position as a private party petitioning the government. *Noerr–Pennington* protection does not apply to the government, of course, since it is impossible for the government to petition itself within the meaning of the first amendment.

The City argues, however, that equity demands that the Local Government Antitrust Act of 1984, 15 U.S.C. § 35 (1985 Supp.), which protects local governments completely from liability for antitrust damages, should apply retroactively. We leave this question to the district court which did not address it, because one of the factors that needs to be considered in determining the propriety of retroactive application is the financial harm a treble damage award could inflict on a municipality and its taxpayers. 130 Cong.Rec. H.12, 187 (Daily Ed. Oct. 11, 1984) (remarks of Rep. Fish). Until the jury has determined the damage award under the antitrust theory, we have no way of evaluating the harm to the municipality. Once the damage award has been determined, the district court may then evaluate the City's claim that the Local Government Antitrust Act of 1984 should apply retroactively.

### D.

VIP's arguments as to prejudgment and postjudgment interest are moot now that we have set the judgment aside.

## IV

### A.

■ Turning to the issues in the City's cross-appeal, we deal first with its arguments about the section 1983 claim. Many of the City's arguments relating to this claim revolve about the City's contention that it never reached a final decision regarding VIP's zoning problems because VIP did not bring its complaint to the highest authority, that is, the Board of Adjustment, for a final interpretation. We disagree that there was no "final decision" cognizable under section 1983. The building inspector had requested and received the Board of Adjustment's interpretation of the zoning code during the Silver Screen case. He had clearly made this request for guidance in his duties. According to the City, the Board of Adjustment *is* the final decision making authority on these issues. Thus, the building inspector was acting pursuant to his authority from the Board in sending out the zoning violations. *See Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984). The combination of the zoning policy decision by the Board and the issuance of the violation notice by the highest City official empowered to execute it, resulted in a policy decision that can be attributed to the City. *St. Louis v. Praprotnik*, —— U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The fact that VIP could appeal for a possible variance, or could urge the Board to reconsider and change its prior expressed policy, does not render nonfinal the decision made pursuant to and in accordance with established policy. Furthermore, we agree with the district court that, as part of the first amendment violation, the building inspector's sending of zoning violation notices to VIP and all of its customers (without prior warning or notice to VIP) and informing them that they had fifteen days to cease use of the cable system gave the jury sufficient evidence to determine that this City action caused an immediate chilling effect on VIP's first amendment rights, as evidenced by the fact that numerous customers were understandably upset and informed VIP promptly that they wish to cease receiving its service. The building inspector was clearly the final authority in regard to the decision to implement established policy by sending out the violation notices. There was no effective appeal that could retract the effect that those notices had upon VIP's business and freedom of speech.

■ The City's argument that VIP could have applied for a variance does not affect the fact that the zoning violation notices were issued pursuant to City policy with immediately resulting injury to VIP. As to damages, the jury was entitled to conclude that VIP's decision to shut down its operations for a few days was a reasonable reaction to a notice requiring it to shut down its operations, and that it may have taken some time for VIP to realize the extent of its options. When the jury considers damages on remand, it should consider whether VIP could have mitigated damages by applying for a variance to the Board of Adjustment.

■ There was also sufficient evidence to support the jury's section 1983 verdict on the first amendment theory, since the jury could reasonably have found that the City's actions failed to satisfy the test for time, place and manner restrictions of speech, within the meaning of *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Pursuant to this authority, the City had to demonstrate *both* that the restraints furthered a substantial government interest and that they allowed reasonable alternative avenues of communication. *Id.*, 106 S.Ct. at 928. We need not decide the first prong of this test, whether the zoning regulation in this instance furthered any substantial governmental interest, since the restraint on Video's speech failed the second prong. The jury was justified in finding that the City's abrupt issuance, without notice to VIP, of zoning violation notices to it and all of its customers did not leave reasonable alternative avenues of communication. We need not address the question whether the avenues need be commercially viable, since in this case VIP's initial notice required it to shut down within fif-

teen days. Clearly the jury was entitled to find that, at least for a short time, VIP's free speech was paralyzed, and also to find that VIP may have suffered long-term damages as a result of this temporary paralysis.

We repeat that on remand of the issue of damages, the jury should be instructed about mitigation of damages and be allowed to evaluate whether VIP's failure to pursue the City's avenues for relief from established policy meant that the City is not liable for the entire amount of VIP's losses between the first contract to sell and the second. On retrial, the district court should also take care to assure that the damages that the jury awards under section 1983 are not duplicative of any awarded under the antitrust claim, and should render judgment accordingly.

We agree with the district court that we need not examine the other constitutional claims (taking, equal protection) that VIP asserted to support its section 1983 claim. The first amendment violation is sufficient to support the jury's finding of liability. We are, however, for reasons we earlier noted, remanding the case for an entirely new trial on all damages, including those attributable to this section 1983 claim.

### B.

 We believe that the explanations above make it clear that the jury was entitled to infer that the City's conduct was the proximate cause of VIP's injuries. The City offers other reasons why VIP's stock value may have declined, but it does not sufficiently exclude the jury from concluding that the City's own actions, including its arrangements with WAX, its interpretation of the zoning code, and its issuance of violation notices to VIP and its customers, played the predominant and major role in that decline.

 The City also argues that the only evidence of any damages suffered was the $1.245 million, which was the difference between the contract for sale of VIP before and after the zoning violation charge. The City argues that this amount was lost by Parrish and Weiss, VIP's stockholders, not VIP itself. It further argues that since there is no evidence of the amount of damages sustained by VIP, it is not entitled to any actual or punitive damages. We disagree. The value of VIP's stock or assets reflects the value of the corporation, and any diminution in value represents damage to that corporation, on which it can sue. Thus, VIP may claim its compensatory damages. The City, however, is not liable for any punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981).

### C.

As to the attorneys' fees awarded by the district court, the validity of the amount is moot since we have set aside the damage verdicts pending a new trial. The district court should reconsider this question after the jury renders its new award.

### V

We affirm the district court's well reasoned opinion on all grounds except that we find necessary a new trial on all questions of damages for the reasons we have stated. The court's instructions on damages should include the issue of mitigation. We have noted our special concern, for example, whether, after the cancellation notices were sent to VIP's customers and before the final sale to the Campbells, VIP should have appealed the building inspector's decision to the Board of Adjustment, and, if so, whether its damages would have been reduced. The district court should consider the applicability of retroactive application of the Local Government Antitrust Act of 1984 subsequent to the jury's reevaluation of damages. The district court should also have special concern that the ultimate damages VIP receives are not duplicative. There can be no punitive damages awarded against the City, and the district court's decisions on attorneys' fees must be reconsidered after retrial. WAX, of course, is excused from all liability and all further proceedings in this case.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

GARWOOD, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Jolly's persuasive opinion except as it holds the City of Dallas liable under the Sherman Act and for First Amendment violations under section 1983 on account of the issuance by its building inspection department of notices that VIP was in violation of the accessory use provisions of the Dallas Development Code. In the context of this case, such action by the City's building inspection department is not, in my view, an adequate basis on which to impose liability because it was without any legal significance and did not constitute the City's legally final determination that a zoning violation had occurred.

The City did not cut off VIP's utilities or take any kind of physical action against VIP; it did not institute suit or procure any type of restraining order; no permit or other requests by VIP were denied by the City. VIP has not explained how the notices in question constituted legally anything more than the formal expression of opinion of the building inspection department that VIP was in violation of the zoning ordinance.[1] Under the ordinances of the City, and under Texas Local Government Code, § 211.010(c), VIP could have appealed to the City's Board of Adjustment and challenged the building inspection department's construction of the accessory use provisions of the ordinance; VIP could have also thus sought a variance from the Board of Adjustment.[2] In the event of such appeal, all action by the building inspection department or other City officials would have been entirely stayed pending resolution of the appeal.[3] Although the Board of Adjustment had previously indicated its agreement with the building inspection department's construction of the ordinance in the Silver Screen case, nevertheless VIP was not a party to that proceeding, the issue was not actually presented there, and the Board of Adjustment did not have the benefit of conflicting arguments being made to it by the parties. It was not shown to be a foregone conclusion that the Board of Adjustment would adopt the same construction of the accessory use provisions of the ordinance in an appeal by VIP, or that it would deny VIP a variance. The Board of Adjustment, which is as much an agency of the City of Dallas as is the building inspection department, is the City's final authority for interpreting its zoning ordinances and granting variances therefrom. That, coupled with the lack of any relevant legal effect of the building inspection department's violation notices, renders it inappropriate to hold the City liable merely because such notices were issued. A final decision by the City, with actual concrete legal injury, was not shown to have ever occurred. *Cf. Williamson County Re-*

1. Had the accessory use provision of the Dallas ordinance been construed to have the meaning which the building inspection department understood it to have, that would not have rendered the ordinance facially unconstitutional.

2. It is true that, under Texas Local Government Code, § 211.009(c), the building inspection department's notices may have had the legal effect of requiring a four-to-one or five-to-zero vote in VIP's favor at the Board of Adjustment in order for VIP to prevail on an appeal. However, as VIP never took an appeal, this is irrelevant.

3. Section 211.010(c) provides:

"(c) An appeal stays all proceedings in furtherance of the action that is appealed unless the official from whom the appeal is taken certifies in writing to the board facts supporting the official's opinion that a stay would cause imminent peril to life or property. In that case, the proceedings may be stayed only by a restraining order granted by the board or a court of record on application, after notice to the official, if due cause is shown."

It is obvious in this case that the exception "imminent peril to life or property" would not be applicable.

While the Dallas Development Code authorizes the building inspection department to have utilities disconnected in case of zoning violations, the City never did this. Although its violation notice threatened to take such action after fifteen days, the fifteen-day period was sufficient for appeal to the Board of Adjustment and such appeal by its stay provisions would have prevented any such action. I also observe that under the Dallas Development Code it is a defense to prosecution that the person prosecuted is in compliance with an order of the Board of Adjustment, even if the party's action would otherwise constitute a violation.

*gional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985); *City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 924, 926, 99 L.Ed.2d 107 (1988).