**CITY OF HOUSTON, Texas, and Ronald Hudson, being sued in his official capacity as the Houston Sign Administrator, Appellants,**

v.

**Joseph and Nancy De TRAPANI, d/b/a All Discount Signs, Appellees.**

No. A14–88–00610–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 25, 1989.
Rehearing Denied June 22, 1989.

---

Monroe Northrop, Laura S. Portwood, Houston, for appellants.

Richard L. Rothfelder, A. Andrew Gallo, Houston, Russell H. McMains, Corpus Christi, for appellees.

Before J. CURTISS BROWN, C.J., and JUNELL and DRAUGHN, JJ.

## OPINION

JUNELL, Justice.

This case involves the liability of a municipality for erroneously interpreting its own ordinance. After enacting new regulations applicable to portable signs, the city of Houston gave notice to sign owners of an impending deadline for sign removal. The plaintiffs took down their billboards in reliance on the city's mistaken reading of the law, only to learn of the error after the deadline for erecting "new" signs—resulting in a loss of what had been their business. A jury found the city had effected an unconstitutional taking of property, and the plaintiffs procured a judgment for slightly more than $500,000. We affirm the judgment as modified.

### I.

All parties have long agreed that the city's original interpretation of the ordinance was in error; the dispute arises only from the plaintiffs' reliance on that misconstruction. Plaintiffs sought compensatory relief under 42 U.S.C. § 1983 and declaratory relief pursuant to TEX.CIV.PRAC. & REM. CODE ch. 37. The city raises threshold objections to the trial court's jurisdiction, contending that no justiciable controversy existed, and that declaratory relief is unavailable with respect to a penal ordinance.

■ First, we reject the contention of nonjusticiability, because a live dispute continued to exist: agreement that an error was made hardly settled the question of liability for property damage. Second, the city's challenge to declaratory relief seems to rest on the traditional reluctance of an equity court to involve itself in criminal matters. *See, e.g., Texas Liquor Control Board v. Canyon Creek Land Corp.,* 456 S.W.2d 891 (Tex.1970); *City of Fort Worth v. Craik,* 411 S.W.2d 541 (Tex.1967). Yet "a declaratory judgment action is a statutory creation, and by its nature is neither fish nor fowl, neither legal nor equitable." *American Safety Eqpt. v. J.P. Maguire & Co.,* 391 F.2d 821, 824 (2d Cir.1968). For this reason the doctrine of equitable noninterference is inapposite. Declaratory relief was entirely appropriate. We overrule points of error one and two.

### II.

#### A.

■ On the merits the city maintains that it took no property, and certainly committed no violation of due process or equal protection guarantees. This argument proceeds roughly as follows. First, plaintiffs lacked a cognizable property interest. Second, the city never took any such interest, in that the notice letter was purely prospective; that is, the mere announcement of a taking is not a taking. *See Thurow v. City of Dallas,* 499 S.W.2d 347, 348 (Tex.Civ. App.—Dallas 1973, writ ref'd n.r.e.). Third, plaintiffs had access to plentiful due process but failed to avail themselves of such avenues as seeking operating permits and appealing any denials to the General Appeals Board (thence to the City Council).

We squarely hold that plaintiffs had a property interest under state law. And although governmental preparation for a taking need not necessarily constitute an invasion of protected interests, it is clear that the municipality's conduct went beyond pure announcement. *Cf. Danforth v. United States,* 308 U.S. 271, 286, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939) ("The mere enactment of legislation which authorizes condemnation of property cannot be a taking."). Here the city prompted the plaintiffs to take certain measures which could not be reversed. This is plainly not a case in which the claimants must wait for some future shoe to drop. To the contrary, the city sign administration succeeded in

achieving its enforcement goals, and the city continues to deny the possibility of allowing restoration to the status quo (assuming the signs had not been destroyed). We overrule points of error three through six and need not reach the seventh, which deals with equal protection. The eight point of error will be taken into account in our consideration of damage questions.

### B.

■ Next the city contests liability under 42 U.S.C. § 1983 on the ground that no one ever executed official policy against the plaintiffs. Municipal liability under § 1983 must be predicated on governmental custom or policy. *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A single act may suffice to create liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The salient issue here is whether the sign administrator qualifies as a policymaker, or whether that policymaking authority resides elsewhere—such as in the City Council. If the conduct of the sign administrator fails to qualify as execution of official policy, the city cannot be liable under § 1983 for his actions. Because state law, not federal, is dispositive of this question, *see City of St. Louis v. Prapotnik*, 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988), we turn to the ordinance itself.

Section 4604 of the ordinance provides for the appointment of a sign administrator:

(a) Sign Administrator. The director of public works shall appoint a sign administrator to administer and enforce the terms and conditions of this chapter and all other provisions of laws relating to signs. The sign administrator is empowered to delegate the duties and powers granted to and imposed upon him by this chapter to other persons serving under the sign administrator. The sign administrator and such other persons shall constitute the Sign Administration Section of the Public Works Department. The sign administrator is directed to enforce and carry out all provisions of this chapter.

(b) Enforcement Responsibility. The duties of the sign administrator shall include not only the issuance of permits as required by this chapter, but also the responsibility of ensuring that all signs comply with this chapter and any other applicable law, and that all signs for which a permit is required do, in fact, have a permit. The sign administrator shall make such inspections as may be necessary and initiate appropriate action to bring about compliance with this chapter and other applicable law if such inspection discloses any instance of noncompliance. The sign administrator shall investigate thoroughly any complaints of alleged violations of this chapter.

It then defines the scope of his authority:

(c) Powers of Sign Administrator. The sign administrator shall have the power and authority to administer and enforce the conditions of this chapter and all other laws relating to signs. Included among such powers are the following specific powers:

1. Every sign for which a permit is required shall be subject to the inspection and approval of the sign administrator. When deemed advisable by the sign administrator, a sign may be inspected at the point of manufacture if such point is within or adjacent to the sign code application area.

. . . .

3. Upon notice and issuance of a stop order from the sign administrator, work on any sign that is being conducted in a manner contrary to the provisions of this chapter or is being conducted in a dangerous or unsafe manner shall be immediately stopped. Such notice and order shall be in writing and shall be given to the owner of the property, or to his agent, or to the person doing the work, and shall state the conditions under which work may be resumed. Where an emergency exists, written notice shall not be required to be given by the sign administrator. Following the issuance of a stop order, the sign administrator shall initiate proceedings to revoke any permit

issued for the work covered by such stop order, consistent with Section 4604(c) 4 of this chapter, unless the cause of the stop order is resolved to the sign administrator's satisfaction.

4. The sign administrator shall have, and is hereby granted, the power and authority to revoke any and all licenses or permits authorized by this chapter for violation of the terms and provisions of this chapter, provided that the sign administrator shall conduct a hearing prior to the revocation of any license or permit authorized under this chapter to determine the facts incident to the pending revocation. The person whose license or permit is under consideration shall be given at least ten calendar days' written notice of the hearing and shall be permitted to present relevant facts and legal argument regarding the pending revocation. Following such hearing, the sign administrator shall consider the merits of the case and shall present a written opinion prior to any action. Provided further, however, that if, in the opinion of the sign administrator, the health, safety or welfare of the citizens of the sign code application area is endangered by any violation of this chapter, the sign administrator may immediately revoke any or all licenses or permits authorized by this chapter and shall conduct the necessary hearings as soon as possible thereafter, but in no case later than three business days after the effective date of the revocation unless the affected licensee or permittee shall request in writing a later date.

5. The sign administrator shall have the authority to adopt regulations required to implement the provisions of this chapter.

. . . .

Finally, there is a provision for review by the City Council:

(e) Appeals. Any person wishing to appeal a decision of the sign administrator on the grounds that the decision misconstrues or wrongly interprets this chapter may within 30 days after the decision appeal the same to the General Appeals Board of the City of Houston, pursuant to its rules and regulations, and thence to the City Council, provided that the appealing party shall give notice of appeal in writing to the city secretary of the City of Houston no less than ten days following the decision appealed from, and provided further that the appealing party shall comply with the sign administrator's decision pending appeal unless the sign administrator shall direct otherwise.

The essence of the city's position is that because *final* authority to make policy resides exclusively in the council, decisions of the sign administrator are not chargeable to the municipality. This argument is founded on Supreme Court pronouncements which attempt to strike a balance between respondeat superior on the one hand, and blanket immunity on the other. Thus:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

*Prapotnik*, 108 S.Ct. at 926 (emphasis in original). *See also Pembaur*, 106 S.Ct. at 1299 ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.") (footnote omitted). In the city's view, only the council has the capacity to act on behalf of the city; conduct by the sign administrator constitutes nothing more than the actions of an employee.

■ Appellees argue that § 4604 itself delegates sufficient authority to the sign administrator for us to find him a final policymaker. They also point to the testimony of the assistant sign administrator, to the effect that he and his supervisor had such power. This testimony presents us with a dilemma, for the *Prapotnik* court was divided over the question of how much weight to afford such testimony. A plural-

ity of four limited itself to consideration of textual materials such as a city charter, ordinance, or other official enactments. By this view "the identification of policymaking officials is not a question of federal law and it is not a question of fact in the usual sense." 108 S.Ct. at 924 (opinion of O'Connor, J., joined by Rehnquist, C.J., White and Scalia, JJ.). Three concurring justices refused to take state law as anything more than a starting point for a properly instructed jury to consider, in that "ultimately the factfinder must determine where such policymaking authority actually resides and not simply 'where the applicable law purports to put it.'" 108 S.Ct. at 934 (opinion of Brennan, J., joined by Marshall and Blackmun, JJ., concurring in the judgment) (citation omitted). It is clear that we simply have no definitive holding upon which to rely in deciding where to look for the placement of policymaking authority. Nor is it unreasonable to suspect that the Court will continue to wrestle with its own § 1983 jurisprudence for the foreseeable future. Accordingly, we must reason from the more general doctrines common to *Monell* and its progeny.

### C.

The preponderance of § 1983 problems arise in contexts other than the takings arena. It is therefore unsurprising that the Court has struggled with the relationship between constitutional torts and common law torts. *See, e.g., Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligent injury to life, liberty, or property does not implicate the due process clause); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (same). Indeed, the specter of respondeat superior from which the judiciary has recoiled is purely a tort law concept, traditionally confined to disputes between private parties. *Governmental* takings are, of course, entirely different by definition. This conclusion is bolstered by the Court's comment in *Daniels* that the parameters of § 1983 may depend on the right implicated. *Id.*, 106 S.Ct. at 664 ("depending on the right, merely negligent conduct may not be enough to state a claim"). Accordingly, we are disinclined to give § 1983 the restrictive reading which the city advocates on the basis of cases outside the arena of takings.

*Monell* is best known for its focus on policy or custom, but it is instructive to examine the context in which that phrase appears: "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, 694, 98 S.Ct. 2018, 2022, 56 L.Ed.2d 611 (1978). We see no reason why the acts of the city sign administrator cannot "fairly be said to represent official policy." To be sure, the ordinance provides for ad hoc council review of particular decisions. However, this necessarily limited form of review does not convert the administrator's acts into purely personal conduct. *See Prapotnik*, 108 S.Ct. at 935 & n. 7 (Brennan, J., concurring in the judgment). Otherwise a municipality might enact a perfunctory ban on unlawful practices, along with a mechanism for council veto, and then contend that no policy was ever final until an aggrieved party lost an appeal to the council.

Furthermore, the city asserts that the plaintiffs' signs, once removed, could not be reinstalled. The city rests this conclusion on a lack of authority in the sign administrator's office to grant a waiver for equitable reasons. It would seem then that *this* policy—the policy against permitting restoration—was assuredly final. It was this policy which caused injury to the plaintiffs, and it is for this reason that the city is incorrect in arguing there was never an execution of policy. To the contrary, the city set out to effect changes in the extraterritorial jurisdiction; it now has the benefit of precisely the sort of changes it sought.[1] In our view there has been a

---

1. Suppose for the sake of argument that the city council enacted the ordinance solely for the purpose of aesthetic improvement. That objec-

tive has now been accomplished. Plaintiffs' signs are gone and gone forever, because the ordinance bars restoration. The city now has

taking pursuant to official policy. *See Video Int'l Prod. v. Warner–Amex Cable Comm.,* 858 F.2d 1075, 1087 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989).

Although the briefs and arguments have not framed the issues as tightly as we would have preferred, it appears that our disposition of the § 1983 matter essentially does away with the need to consider the city's other arguments in avoidance of liability. We find sufficient evidence to uphold the jury's answers to liability issues, and we therefore overrule points of error nine and ten. It is unclear to what extent points eleven through twenty survive as live questions, but to the extent that they remain (such as in challenging evidentiary sufficiency), we overrule them.

### III.

The remainder of the case concerns damages and the award of attorneys fees. The city challenges the sufficiency of the evidence supporting all monetary awards. Our review of the record persuades us that the jury could properly have found as it did. There was fairly extensive testimony on damages, accompanied by relevant documentation, which would allow the monetary findings to stand—at least as factual determinations.

■ Two questions of law require attention. First, the city alleges a double recovery was had. We agree. Special issue three inquired about damages in two categories: loss of revenue, and reasonable market value of 105 signs which were destroyed. The jury found $500,000 in lost revenue, and $21,000 for the value of the signs. Because the latter assessment ought to be subsumed in the former, we order a deletion of the $21,000 award.

■ Next, the city correctly argues that attorneys fees are not recoverable from a municipal defendant in a declaratory judg-

ment action, where a governmental function is involved. *See City of Houston v. Lee,* 762 S.W.2d 180 (Tex.App.—Houston [1st Dist.] 1988, writ requested). Nevertheless, the plaintiffs remain entitled to attorneys fees pursuant to 42 U.S.C. § 1988 because they have prevailed in their § 1983 suit. Moreover, their success renders immaterial the city's complaint about the trial court's unconditional award of appellate legal fees. We overrule points of error eight and twenty-one through forty, with the exception of number twenty-eight (double recovery) which is sustained.

The judgment of the trial court is affirmed as modified.

the benefit of the beautification it sought, and it is for this benefit that the city must pay.

It is of course immaterial to the constitutional analysis whether the municipality was interested in aesthetics, or in some other qualities. Nor need the taking be an acquisition of physical control. *See United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945). What matters is that the government pay just compensation for the benefit it now has.