The CITY OF HOUSTON, Appellant,

v.

MAGUIRE OIL COMPANY, Maguire Energy Company, Cary M. Maguire, Cary M. Maguire as Manager for the Oil Fund U/I/D 9/1/76, Cary M. Maguire as Trustee UTD 1/1/83 FBO Cary M. Maguire, Jr., Cary M. Maguire as Trustee UTD 1/1/83 FBO Melinda Ambler Maguire, Cary M. Maguire as Trustee UTD 5/1/84 FBO Ann Blaine Maguire, Don R. Holloway as Custodian of the W. Matthew Holloway Tugtma, Don R. Holloway as Custodian of the Sarah L. Holloway Tugtma, Don R. Holloway as Custodian of the Barbara Ann Holloway Tugtma, Don R. Holloway as Custodian of the Tillman R. Holloway Tugtma, William N. Col-

lins, Jr., as Custodian of the L. Paige Collins Tugtma, William N. Collins, Jr., as Custodian of the Hattie S. Collins Tugtma, and William N. Collins, Jr., as Custodian of the Chandler Collins Tugtma, Appellees.

No. 14–09–00701–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 3, 2011.

J. Mark Breeding, C. Charles Dippel, Frederick D. Junkin, Paul Stephen Radich, Mark Lynn Merrell, Houston, for appellant.

Donald E. Herrmann, Todd William Spake, John Thomas Wilson IV, Fort Worth, David T. Hedges, Jr., James Claiborne Crawford, Houston, for appellees.

Panel consists of Justices SEYMORE, BOYCE, and CHRISTOPHER.

## OPINION

WILLIAM J. BOYCE, Justice.

The City of Houston appeals from a judgment in favor of Maguire Oil Company and others [1] arising from an inverse condemnation claim predicated on the errone-

---

1. We refer to the numerous appellees collec- tively as "Maguire."

ous invocation of an inapplicable city ordinance to revoke Maguire's natural gas drilling permit. We affirm the trial court's judgment.

## Background

The fight over Maguire's thwarted effort to drill for natural gas near Lake Houston is poised to mark its twentieth anniversary. This dispute encompasses one drilling site, two trials, three trial courts, four appeals,[2] and five Houston mayors.

### I. Factual Background

The City acquired surface rights to land in the 1940s that eventually was inundated to create Lake Houston. The City adopted an ordinance in 1965 that generally proscribed pollution in the "control area" of Lake Houston. The City amended the ordinance in 1967 to restrict drilling in the Lake Houston "control area." The term "control area" is significant to this litigation.

"Control area" was defined in the 1965 ordinance as "[t]hat land around the Lake within an area five (5) miles in width measured from the Normal Water's Edge of, and within the watershed of, Lake Houston." The City Council amended the definition of "control area" in 1977 to equate that term with the City's "extraterritorial jurisdiction." The shifting definition of "control area" later played a key role in the dispute. Although the definition was amended again in 1997 to expand the scope of the "control area," the 1977 definition governs this dispute.

Between 1953 and 1991, Maguire acquired oil and gas leases covering five tracts near Lake Houston known collectively as the "Scanlan Deep Prospect." The leases encompassing the Scanlan Deep Prospect are identified as the Scanlan, Wheless, Charpiot, Johnston, and Deussen leases.

Maguire began to investigate drilling a gas well in the Scanlan Deep Prospect in the late 1980s. Maguire initially drilled outside the city limits. After the failure of a vertical well, described as the Scanlan Deep No. 1, Maguire attempted to drill directionally. This attempt also failed. These efforts cost several million dollars.

Maguire then decided to drill a vertical well named the Wheless No. 1 inside the city limits approximately 300 feet west of Lake Houston. Maguire filed appropriate documents and asked the City to issue a drilling permit in 1991. The City approved a permit on May 7, 1991 to drill at the chosen location. The City later ratified and extended the permit. Maguire spent at least $250,000 in preparation for drilling; it cleared the location, built dikes, built roads, and signed a drilling contract.

A Lake Houston patrol noticed Maguire's drilling site in October 1991 and contacted Richard Alexander, an inspector with the City's Public Works and Engineering Water Quality Control Department. Alexander inspected the site and determined that it was approximately 300 feet from the water's edge of Lake Houston. Alexander informed his supervisor, Senior Inspector Henry Aghedo, about the location of Maguire's drilling site. Alexander also contacted Milton Belveal, senior inspector with the Planning and Development Department, who acknowledged that a permit had been issued to Maguire.

---

**2.** This is the fourth appeal spawned by this litigation. In chronological order, the first three appeals are (1) *Maguire Oil Co. v. City of Houston,* 143 F.3d 205 (5th Cir.1998); (2) *Maguire Oil Co. v. City of Houston,* 69 S.W.3d 350 (Tex.App.-Texarkana 2002, pet. denied); and (3) *Maguire Oil Co. v. City of Houston,* 243 S.W.3d 714 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

Aghedo consulted with his superior, Roger Hulbert, who was the deputy assistant director of the Public Works and Engineering Water Quality Control Department. Hulbert believed Maguire's permit had been issued in error and that drilling had to be stopped. Hulbert therefore instructed Alexander to issue a stop work order.

On October 31, 1991, Alexander issued a stop work order pursuant to City of Houston Code of Ordinances Chapter 23, Article IV, section 23–102, and delivered the order to Maguire's drilling site. Section 23–102 states as follows: "No well shall be drilled within the control area of Lake Houston which is nearer than 1,000 feet from the normal water's edge of Lake Houston or any of its drains, streams or tributaries."

That same day, the City also wrote Maguire a letter stating that its drilling permit had been issued in error and was being revoked immediately because City of Houston Code of Ordinances sections 23–101 and 23–102 prohibit wells within 1,000 feet from Lake Houston. The letter was drafted by Donna Kristaponis, director of the Planning and Development Department, and stated as follows:

> This [sic] to inform you that the above referenced permit appears to have been issued in error and is revoked effective immediately. All work in connection with the drilling of this well must cease immediately. Failure to cease operations will result in the issuance of a citation for each day of continued operations.
>
> City of Houston Code of Ordinances Sections 23–101 and 23–102 prohibit wells from being drilled within 1000 feet from the normal water's edge of Lake Houston. It appears that the entire 40 acre Wheless No. 1 site is within the

1000′ setback requirement and, therefore, no wells may be drilled on it.

> I apologize for any inconvenience this may have caused you.

Maguire's original permit application was processed by Gloria Minor and approved by Hal Caton, Minor's supervisor in the Planning and Development Department. Maguire's renewal application was processed by Belveal and approved by Caton. Before October 31, 1991, Minor and Belveal were not aware of the provisions in chapter 23 of the City of Houston Code of Ordinances restricting the drilling of wells near Lake Houston. Kristaponis and Caton handled the revocation of Maguire's drilling permit, and Belveal was told that the permit had been revoked because the well would be drilled too close to Lake Houston.

Maguire met to discuss the permit revocation with the Legal, Health, and Planning and Development departments; Maguire also met with the deputy assistant director of the Public Works and Engineering Water Quality Control Department. No resolution was reached. All of the City's representatives maintained that the ordinance prohibited drilling within 1,000 feet of Lake Houston, and that no department would issue a permit that did not comport with the ordinance. Deputy Assistant Director Hulbert steadfastly maintained that his department would not issue a drilling permit. Maguire attempted to communicate with the mayor, but these efforts failed.

## II. Procedural Background

On October 27, 1993, Maguire sued the City in the 55th District Court of Harris County for damages and a declaratory judgment. Maguire alleged that "certain actions taken by the City against mineral interests [Maguire] owned near Lake Houston amounted to, *inter alia*, (1) a taking without adequate compensation or

due process of law; and (2) unreasonable discrimination against a mineral property owner." *Maguire Oil Co. v. City of Houston,* 143 F.3d 205, 206 (5th Cir.1998).[3] Maguire also asserted claims for negligent misrepresentation, estoppel, and promissory estoppel against the City. *Id.*

The City removed the case to the United States District Court for the Southern District of Texas on federal question grounds. *Id.* After a jury returned a verdict in favor of the City, the federal district court determined that it lacked subject matter jurisdiction; remanded the case; and imposed $98,578.10 in sanctions because the City "wrongfully caused the removal of this case from state court to federal court and, thereafter, deliberately concealed from the Court and counsel information pertinent to this Court's jurisdiction, all of which caused a multiplication of proceedings and the needless duplication of time and expense." *Id.* at 207–08. The City appealed the federal district court's sanctions order. *Id.* at 206. The Fifth Circuit held that the district court abused its discretion by imposing sanctions, and reversed the district court's sanctions order. *Id.* at 212.

### A. *Maguire I*

Following remand to the 55th District Court of Harris County, the City and Maguire filed summary judgment motions. *Maguire Oil Co. v. City of Houston,* 69 S.W.3d 350, 356 (Tex.App.-Texarkana 2002, pet. denied) (*"Maguire I"*). The trial court granted the City's motions for summary judgment. *Id.* at 356–57. Maguire appealed the trial court's judgment; its appeal was heard by the Texarkana Court of Appeals.

In *Maguire I,* the court of appeals held that summary judgment was proper on

Maguire's negligent misrepresentation claim but improper as to Maguire's claims for inverse condemnation, reliance damages based on promissory estoppel, and selective enforcement. *Id.* at 372. Therefore, the court affirmed the trial court's judgment in part, reversed in part, and remanded the case for further proceedings in the trial court. *Id.*

In so doing, the Texarkana Court of Appeals rejected the City's argument that Maguire's inverse condemnation claim was barred by the statute of limitations. The City contended that the limitations bar applied because (1) section 23–102 was enacted in 1967; and (2) Maguire was required to file any inverse condemnation action within ten years of its enactment. *Id.* at 358. The court concluded that Maguire's inverse condemnation claim was not barred by the statute of limitations because section 23–102 did not apply to Maguire's drill site in 1991. *Id.* at 359–60.

The court stated that the 1967 ordinance prohibited drilling wells "within 'the control area of Lake Houston which is nearer than 1000 feet from the normal water level of Lake Houston.'" *Id.* at 358–59. It further noted that the term "control area" first was defined in the 1965 ordinance as " '[t]he land around the Lake within an area of five (5) miles in width measured from the Normal Water's Edge of, and within the watershed of, Lake Houston.'" *Id.* at 359. But the governing 1977 version of the ordinance redefined the "control area" as "[t]hat land contained in the extraterritorial jurisdiction of the City of Houston, Texas, which contains waters that flow into or adjacent to the watershed Lake Houston.'" *Id.* The court concluded that the governing 1977 version of the City's ordinance did not apply to Maguire's

---

**3.** Maguire's inverse condemnation claim was premised on (1) the Fifth and Fourteenth Amendments to the United States Constitu-tion; and (2) Sections 17 and 19 of Article I of the Texas Constitution. *Maguire Oil Co.,* 143 F.3d at 206 n. 1.

lease because that lease was within the City limits rather than the City's extraterritorial jurisdiction. *Id.*

### B. *Maguire II*

Following remand to the district court in *Maguire I*, Maguire re-filed its inverse condemnation claim in the County Civil Court at Law Number Four. *Maguire Oil Co. v. City of Houston*, 243 S.W.3d 714, 718 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) ("*Maguire II*").[4] Maguire and the City again filed motions for summary judgment. *Id.*

Among its grounds for summary judgment, the City urged that Maguire's takings claim was not ripe. *Id.* The trial court asked the City to restyle its ripeness challenge as a plea to the jurisdiction and requested briefs. *Id.* The trial court granted the City's plea to the jurisdiction and dismissed Maguire's case on November 29, 2005. *Id.*

On appeal, the City contended that Maguire failed to obtain an appealable final decision because it did not pursue an appeal to the City Council and did not seek a proper remedy. *Id.* at 719. Maguire argued that it obtained a final decision, and that any further administrative appeals would have been futile. *Id.* This court determined that Maguire's claims were ripe for adjudication, reversed the trial court's judgment, and remanded the case for further proceedings. *Id.* at 722.

*Maguire II* reaffirmed *Maguire I*'s holding that section 23–102 did not apply to Maguire's drilling site in 1991 even though it became later applicable when the ordinance's definition of "control area" was amended again in 1997. *See id.* at 718 n.

1. This court determined that the dispute between the City and Maguire was ripe for adjudication because a final decision had been rendered by the proper governmental decision-maker designated under the applicable ordinances, and that any further action on Maguire's part would have been futile. *Id.* at 722.

We determined the identity of the final decision-maker as a question of law, and not as a question of fact, based on interpretation of Chapter 23, Article IV, sections 23–101(2) and 23–104. *See id.* at 719. We concluded that "the director is the only person with authority to grant a drilling permit," and the director "is the relevant decision maker." *Id.* Section 23–101(2) of Article IV, entitled "Water Supply Protection," defines "director" as "[t]he director of public utilities of the city or such other city department head or official having supervision of Lake Houston and other surface water supply facilities of the city." This definition encompassed Deputy Assistant Director Hulbert of the Public Works and Engineering Water Quality Control Department, who instructed Alexander to deliver a stop work order on October 31, 1991 to Maguire's drilling site; it also encompassed Director Kristaponis of the Planning and Development Department, who wrote a follow-up letter announcing the revocation of Maguire's drilling permit.

There is no factual dispute concerning the specific actions undertaken by the deputy assistant director of public works and engineering, by the director of planning and development, and by their subordinates. "Maguire received a final decision from the relevant decision maker." *Id.* at 719. This court rejected the City's

---

4. Maguire's inverse condemnation claim was dismissed from district court and re-filed in County Civil Court at Law Number Four because this court held in *Taub v. Aquila Southwest Pipeline Corp.*, 93 S.W.3d 451, 456 (Tex.

App.-Houston [14th Dist.] 2002, no pet.), that "the county courts at law have exclusive jurisdiction over condemnation and eminent domain cases." *Maguire II*, 243 S.W.3d at 718 (citing *Taub*, 93 S.W.3d at 456).

argument that an appeal to the City Council is a prerequisite to a final decision. *Id.* at 720. It further rejected the City's contention that "Maguire should have sought a writ of mandamus or injunction to force the City to issue the permit in light of Maguire's contention that section 23–102 did not apply to the proposed drill site." *Id.* at 721. In that regard, this court noted that the Texas Supreme Court has "never held that a landowner must seek an injunction or writ of mandamus before proceeding with an action for inverse condemnation." *Id.*

### C. The Trial

After the Texas Supreme Court denied the City's petition for review in *Maguire II,* the case proceeded to trial in the County Civil Court at Law Number Four on March 16, 2009.

Maguire pleaded four separate taking theories in the trial court. In a single trial, the City and Maguire presented evidence relating to (1) the legal question concerning whether there had been a taking of Maguire's mineral property interests; and (2) the fact question concerning damages for such a taking. At the conclusion of the evidence, the City and Maguire agreed that Maguire's inverse condemnation claim presented a question of law for the trial court to decide. The trial court heard arguments from both sides on the takings claim and ruled as a matter of law that Maguire suffered a compensable regulatory taking "[b]ased on the City of Houston's unreasonable interference with the landowner's right to use and enjoy its property and on that theory of law."

The trial court then submitted the damages issue to the jury. The jury was asked: "What is the difference, if any, between the fair market value of PLAINTIFFS' mineral estate at issue in this case immediately before and immediately after the revocation of the drilling permit by the DEFENDANT on October 31, 1991?" The jury returned a unanimous verdict in response to this question awarding Maguire $2 million in damages.

The trial court heard the City's motion for reconsideration of the court's finding of a taking on May 1, 2009. On that same day, the trial court signed a final judgment stating that "Plaintiffs have proved, and the Court finds as a matter of law, that Plaintiffs suffered a compensable taking of their mineral interests by the City of Houston on October 31, 1991." The trial court awarded $2 million in damages in conformity with the jury's verdict.

The trial court signed findings of fact and conclusions of law on June 24, 2009. In pertinent part, the findings of fact and conclusions of law provide as follows.

### Findings of Fact

5. On October 31, 1991, Section 23–102 (the "Ordinance") of the City's Code of Ordinances provided: "No well shall be drilled within the control area of Lake Houston which is nearer than 1,000 feet from the normal water level of Lake Houston or any of its drains, streams or tributaries" (referred to herein as the "Prohibited Area"). This is the same language that was used in 1967 when the Ordinance was first adopted. On October 31, 1991, the term "control area" was defined as: "That land contained in the extraterritorial jurisdiction of the City of Houston, Texas, which contains waters that flow into or adjacent to the watershed of Lake Houston." This had been the definition of "control area" since 1977.

\* \* \*

7. On October 31, 1991, Richard Alexander, a City employee, issued a stop work order directing Maguire to cease drilling operations on the Wheless No. 1

Well. That same day, Donna Kristaponis, another City employee, sent a letter to Maguire, stating that the drilling permit on the Wheless No. 1 Well had been issued in error and was revoked immediately.

8. Erroneously believing the Ordinance applied to the surface location for the Wheless No. 1 Well, Ms. Kristaponis sought to prevent drilling operations from that surface location when she issued the letter revoking the permit for the Wheless No. 1 Well. Likewise, erroneously believing the Ordinance applied to the surface location for the Wheless No. 1 Well, Mr. Alexander sought to prevent drilling operations from that surface location when he issued the stop work order on the Wheless No. 1 Well.

9. Both the stop work order issued by Mr. Alexander and the letter sent by Ms. Kristaponis were issued to enforce the Ordinance, which they erroneously believed prohibited the drilling of an oil or gas well from the approved surface location for the Wheless No. 1 Well, and thereby to protect the water of Lake Houston, which is a source of drinking water for the City. Neither Ms. Kristaponis nor Mr. Alexander intentionally sought to acquire an interest in or to damage any minerals located in the Scanlan Deep Prospect or to prevent the recovery of any such minerals through a directional well drilled from a surface location outside what they understood to be the Prohibited Area.

### Conclusions of Law

1. On October 31, 1991, the Ordinance did not apply to wells drilled within Houston's city limits, such as Maguire's proposed Wheless No. 1 Well. As of that date, the Ordinance limited the 1,000–foot drilling restriction to wells drilled within the City's "extraterritorial juris-diction." *Maguire Oil Co. v. City of Houston*, 243 S.W.3d 714, 718 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (citing *Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350 (Tex.App.-Texarkana 2004 [2002], pet. denied)).

2. Ms. Kristaponis' revocation of the drilling permit on October 31, 1991, and Mr. Alexander's issuance of the stop work order on October 31, 1991, were not authorized by the Ordinance. Maguire thus has suffered a regulatory taking of its mineral interests in violation of Article 1, Sections 17 and 19 of the Texas Constitution, because the City has unreasonably interfered with Maguire's right to use and enjoy its property by preventing drilling at the surface location covered by the drilling permit. *See Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 672 (Tex.2004).

In two issues, the City asks this Court to reverse the trial court's judgment in favor of Maguire and render judgment in favor of the City.

Seizing on the trial court's determination that the 1991 permit revocation and stop work order "were not authorized by the Ordinance," the City contends that a take-nothing judgment is warranted because (1) "unauthorized acts of a government employee do not result in a 'taking' of property by the governmental entity for which the employee works;" and (2) "the City did not intend to take Appellees' mineral interests for public use" by enacting an ordinance that did not apply to Maguire's well, regardless of whether the ordinance was in fact invoked erroneously to preclude drilling.

### Standard and Scope of Review

▮ Determining whether an ordinance accomplishes a regulatory taking for which compensation is required involves the consideration of subsidiary factors, fact

determinations, and all surrounding circumstances. *Sheffield Dev. Co. v. City of Glenn Heights,* 140 S.W.3d 660, 672–73 (Tex.2004); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 932 (Tex.1998); *Rowlett/2000, Ltd. v. City of Rowlett,* 231 S.W.3d 587, 590 (Tex.App.-Dallas 2007, no pet.). While we depend on the trial court to resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether a taking has occurred is treated as a question of law. *Sheffield,* 140 S.W.3d at 673; *Mayhew,* 964 S.W.2d at 933; *Rowlett/2000,* 231 S.W.3d at 590. We review this question of law *de novo. Alewine v. City of Houston,* 309 S.W.3d 771, 775 (Tex. App.-Houston [14th Dist.] 2010, pet. denied).

## Analysis

The Just Compensation Clause of the Fifth Amendment states, "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V; *Mayhew,* 964 S.W.2d at 933. Article I, section 17 of the Texas Constitution similarly provides in pertinent part that no "person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...." Tex. Const. art. I, § 17; *Mayhew,* 964 S.W.2d at 933. "At the heart of the takings clause lies the premise that the government should not 'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 554 (Tex.2004) (quoting *Steele v. City of Houston,* 603 S.W.2d 786, 789 (Tex. 1980)).

Takings can be classified as physical or regulatory. *Mayhew,* 964 S.W.2d at 933. Because "there are several sharp distinctions between physical takings and regulatory takings," it is "often inappropriate to treat cases involving one as controlling precedents for the other." *Lowenberg v. City of Dallas,* 168 S.W.3d 800, 801–02 (Tex.2005) (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 323–24, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)).

■■■ Physical takings occur when the government authorizes an unwarranted physical occupation of an individual's property. *Mayhew,* 964 S.W.2d at 933. Physical possession is, categorically, a taking for which compensation is constitutionally mandated. *Sheffield,* 140 S.W.3d at 669–70.

■■ In contrast to a physical taking, a restriction on the permissible uses of property or a diminution in its value resulting from regulatory action within the government's police power may or may not be a compensable taking depending on the circumstances. *Id.* "'[A]ll property is held subject to the valid exercise of the police power' and thus not every regulation is a compensable taking, although some are." *Id.* at 670 (quoting *City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 804 (Tex.1984)).

■■■ A plaintiff potentially may invoke multiple distinct theories in challenging a government regulation as an unconstitutional taking. The plaintiff may assert (1) a physical taking, which occurs when regulatory action requires an owner to suffer physical invasion of his property;[5] (2) a *Lucas*-type total regulatory taking, which

---

5. A "regulatory action that generally will be deemed a *per se* taking" and, thus, requires just compensation occurs "where government requires an owner to suffer a permanent physical invasion of property—however minor." *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *see also Sheffield,* 140 S.W.3d at 671.

occurs when regulatory action completely deprives an owner of all economically beneficial use of his property;[6] (3) a *Penn Central* taking, which occurs when regulatory action unreasonably interferes with a property owner's right to use and enjoy his property;[7] or (4) a land-use exaction, which occurs when the government requires an owner to give up his right to just compensation for property taken in exchange for a discretionary benefit conferred by the government.[8] *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *see Sheffield*, 140 S.W.3d at 671–72.

In this appeal, Maguire's claim rests primarily on its contention that the City's enforcement of an inapplicable ordinance to preclude drilling near Lake Houston unreasonably interfered with Maguire's right to use and enjoy its mineral estate. Maguire thus contends that compensation is warranted as a regulatory taking under the three factors identified in *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and *Sheffield*, 140 S.W.3d at 671–72. As in *Sheffield*, Maguire does not assert a separate claim under the Takings Clause of the Fifth Amendment to the United States Constitution. Maguire in-

voked only Article I, Sections 17 and 19 of the Texas Constitution in its pleadings. Maguire does not contend that wording differences between the federal Takings Clause and the Texas Constitution affect the analysis in this case. Therefore, in applying the relevant Texas constitutional provision to the circumstances of this case, we look to federal takings jurisprudence for guidance. *See Sheffield*, 140 S.W.3d at 669.

We do not apply the factors identified in *Penn Central* and *Sheffield* in cookbook fashion when determining whether a regulatory taking has occurred. *See id.* at 672–73. Such a determination depends heavily on the individual context and surrounding circumstances. *Id.* " '*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required.' " *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326–27 n. 23, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 634, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)). " 'The temptation to adopt what amount to *per se* rules in either direction must be resisted.' " *Id.*

---

6. "[R]egulations that completely deprive an owner of '*all* economically beneficial us[e]' " of his property are deemed *per se* takings. *Lingle*, 544 U.S. at 538, 125 S.Ct. 2074 (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)) (emphasis in original); *see also Sheffield*, 140 S.W.3d at 671.

7. A regulatory taking occurs when the government has unreasonably interfered with a property owner's right to use and enjoy his property considering the following three factors: (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental ac-

tion." *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Sheffield*, 140 S.W.3d at 672.

8. The government cannot require a person to give up a constitutional right—such as the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit has little or no relationship to the property. *Lingle*, 544 U.S. at 547, 125 S.Ct. 2074 (citing *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)); *see also Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 167 (Tex.App.-Fort Worth 2007, pet. denied).

(quoting *Palazzolo*, 533 U.S. at 636, 121 S.Ct. 2448); *see also Sheffield*, 140 S.W.3d at 672.

### I. Which Takings Theory is the Judgment Predicated Upon?

We first consider which takings theory or theories the trial court relied upon in fashioning its judgment in favor of Maguire. The City contends that the trial court's findings of fact and conclusions of law establish only a single basis for the judgment. Maguire contends that the judgment can be affirmed based on any of four separate takings theories pleaded in the trial court.

Maguire pleaded four separate takings theories in the trial court: (1) a physical taking, *see Gragg*, 151 S.W.3d at 554; (2) a regulatory taking by the denial of all economically viable use of its mineral estate, *see Mayhew*, 964 S.W.2d at 933; (3) a regulatory taking based on unreasonable interference with Maguire's right to use and enjoy its property under the factors identified in *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646, and *Sheffield*, 140 S.W.3d 660; and (4) denial of access to its mineral estate, *see Tarrant Cnty. Water Control & Improvement Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 912 (Tex.1993).

The trial court held that Maguire suffered a compensable regulatory taking "[b]ased on the City of Houston's unreasonable interference with the landowner's right to use and enjoy its property and on that theory of law." At the May 1, 2009 hearing on the City's motion for reconsideration, the trial court stated: "I believe I was pretty clear on the record ... and pretty narrow, was I not, on the basis for my finding of the taking?" And the City's counsel responded, "Yes, you were, Your Honor. It was based upon the *Penn Central* line of cases that are noted by and adopted by the Texas Supreme Court in *City of Sunnyvale v. Mayhew*."

Maguire submitted proposed findings of fact and conclusions of law encompassing all four of its pleaded takings theories. The trial court did not sign Maguire's proposed findings of fact and conclusions of law. Instead, the trial court concluded that Maguire "has suffered a regulatory taking of its mineral interests ... because the City has unreasonably interfered with Maguire's right to use and enjoy its property by preventing drilling." The trial court expressly cited *Sheffield*, 140 S.W.3d at 672. The cited portion of *Sheffield* addresses only a regulatory taking focusing on the factors identified in *Penn Central* for identifying when a regulation constitutes a taking in light of its economic impact on the claimant; the extent to which it has interfered with distinct investment-backed expectations; and the character of the government action. *See id.* The trial court made no findings or conclusions pertaining to the alternative theories Maguire pleaded and submitted in its proposed findings of fact and conclusions of law. Nor did the court cite *Mayhew, Haupt,* or *Gragg*.

The trial court clearly adopted only one theory based on unreasonable interference under the factors identified in *Penn Central* and *Sheffield*. Thus, we will examine whether the judgment in favor of Maguire can stand on the strength of that theory.

### II. Did Interference with Maguire's Right to Drill Constitute a Regulatory Taking for Which Compensation is Due?

The parties labor mightily to frame the central issue on appeal so as to dictate a favorable result. The complexity of inverse condemnation law and the lengthy history of this dispute give both sides leverage to work with as they seek purchase in their definitional wrestling match.

It is undisputed that Maguire's efforts to drill a gas well 300 feet from the shore of

Lake Houston were thwarted in October 1991 when a stop work order was issued and Maguire's drilling permit was revoked. These undisputed actions immediately stopped development at the well site; drilling never resumed, and Maguire's leases eventually lapsed. According to the jury, the City's actions in October 1991 diminished the fair market value of Maguire's mineral estate by $2 million.

The appeal centers on this inquiry: Does interference with Maguire's property rights constitute a regulatory taking for which compensation is required under the factors identified in *Penn Central* and *Sheffield?*

This question leads others. What precisely is the act of regulatory interference at issue? Is it, as the City contends, the passage in 1967 of an ordinance restricting drilling that did not apply to Maguire's drill site in 1991? Or is it, as Maguire contends, the unwarranted enforcement of an inapplicable ordinance? Stated another way, can the erroneous enforcement of an inapplicable ordinance by a City-employed final decision-maker constitute a taking under Article I, sections 17 and 19 of the Texas Constitution?

The parties approach these questions from different starting points.

The City focuses primarily on the ordinance's ***inapplicability*** to Maguire's drilling site. After vigorously contesting this issue earlier in the litigation, the City now makes a virtue of necessity by embracing prior holdings establishing that the ordinance did not apply to Maguire's well site in 1991. *See Maguire II,* 243 S.W.3d at 718 n. 1; *Maguire I,* 69 S.W.3d at 360. According to the City, the ordinance's inapplicability means (1) its employees acted without authorization when they erroneously invoked the ordinance to prohibit drilling in 1991; and (2) the City lacked the requisite intent to appropriate Ma-

guire's mineral interests for public use via the inapplicable ordinance.

The City's new tack in this appeal requires it to abandon a long-held contention that the 1,000–foot prohibition did in fact apply to Maguire's proposed drill site in 1991. It also requires the City to contradict its prior representations to the trial court regarding its intent. In trial court briefing filed during the interim between the decisions in *Maguire I* and *Maguire II,* the City asserted as follows: "The City's intent in adopting the Ordinance was to prohibit the drilling of oil and gas wells in the area between the 45–foot contour and the 1000–foot line, whether such land is located in the City or its extraterritorial jurisdiction." It also asserted: "[T]he City adopted the Ordinance to protect Lake Houston." It further asserted: "The Ordinance is inte[n]ded to further the City's interest in protecting its primary water supply, which certainly is at least as substantial an interest as that upheld by the Court in *Mayhew.*"

The City's current appellate briefing does not address whether the factors identified in *Penn Central* and *Sheffield* support a determination that a taking has occurred. The City has not challenged the trial court's weighing of those factors to conclude that a regulatory taking occurred, and it has not challenged the sufficiency of the evidence underlying any express or implied factual findings in support of the trial court's judgment. Instead, the City contends more broadly that these factors simply do not apply here because enforcement of the ordinance against Maguire in 1991 was unauthorized, and because the City lacked the requisite intent to accomplish a regulatory taking by means of an ordinance that did not apply to Maguire.

In contrast to the City's approach, Maguire focuses primarily on the ***enforce-***

*ment* of the inapplicable ordinance to prohibit drilling in 1991. According to Maguire, the final decision to prohibit drilling in 1991 based on the ordinance (1) resulted in a compensable taking regardless of the ordinance's actual applicability to its drilling site; and (2) demonstrated the City's intent to prohibit the drilling of any wells within 1,000 feet of Lake Houston.

After setting the stage at length, we now address the merits of the City's two bases for attacking the trial court's judgment in favor of Maguire.

### A. Unauthorized Acts

■ We reject the City's first contention that a regulatory takings claim is foreclosed because the City employees who shut down Maguire's operations acted without authorization.

We note initially that the City did not raise its "unauthorized acts" argument in the trial court. In any event, the "unauthorized acts" argument is unavailing because it relies upon inapposite case law addressing waiver of sovereign immunity. *See City of El Paso v. Heinrich,* 284 S.W.3d 366 (Tex.2009); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401 (Tex.1997).

The City relies heavily upon the following sentence from *Heinrich:* "A state official's illegal or unauthorized actions are not the acts of the State." *Heinrich,* 284 S.W.3d at 370 (quoting *Fed. Sign,* 951 S.W.2d at 404). By like token, the City contends that (1) unauthorized acts by City decision-makers are not the acts of the City itself; and (2) the drilling prohibition was "unauthorized" because the ordinance did not apply. Therefore, according to the City, *"Heinrich* and the numerous cases that preceded it establish that an inverse condemnation claim was not the proper remedy for addressing the unauthorized application of the 1,000′ Prohibition to Ma-

guire's proposed drill site." The City contends that the appellees "should have sued Mr. Alexander and Ms. Kristaponis, in their official capacities, to compel them to allow Maguire to drill at the proposed site, which was located in an area not subject to the 1,000′ Prohibition."

The City's unauthorized acts argument fails because the City erroneously attempts to graft standards from an entirely different context addressing an entirely different issue—waiver of sovereign immunity—onto the takings inquiry at issue here.

*Heinrich* did not address a takings claim. *See Heinrich,* 284 S.W.3d at 376 ("Heinrich has not alleged a takings claim."). *Heinrich* focused on waiver of sovereign immunity. *Id.* This case involves no question regarding subject matter jurisdiction or waiver of sovereign immunity because sovereign immunity for takings claims is expressly waived in Article I, sections 16 and 17 of the Texas Constitution. In short, the City's "unauthorized acts" argument erroneously mixes apples and oranges. *See Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001) ("Although sovereign immunity bar[red] ... breach-of-contract claims, the doctrine does not shield the State from an action for compensation under the takings clause.") (citations omitted).

The Texas Supreme Court has cautioned courts and litigants that "it is often inappropriate" to treat cases involving a physical taking as controlling precedents for analyzing a regulatory taking. *Lowenberg,* 168 S.W.3d at 801–02. This caution against reliance upon mix-and-match legal analysis applies with even greater force when the City invites us to reach completely beyond takings case law and import principles from a different body of law

addressing a different issue focusing on waiver of sovereign immunity. The City has identified no cases applying this sovereign immunity precept in the context of a regulatory takings inquiry, and we are aware of no such cases.

The apples-and-oranges nature of the City's argument is underscored by its response to Maguire's contention that the unauthorized acts argument was waived because it was not raised in the trial court. The City responds that "a claim based on *ultra vires* conduct by governmental employees implicates jurisdictional considerations" that can be raised at any time. This response confirms that the City is attempting to transform an inquiry about whether a taking occurred into a jurisdictional-flavored inquiry about whether sovereign immunity has been waived. These are two different inquiries. We will not blend them.

Additionally, we note that the City's "unauthorized acts" contention conflicts with *Maguire II.* We rejected the City's contention that Maguire failed to pursue the proper remedy against the City and was required to appeal the revocation decision to the City Council. *Maguire II,* 243 S.W.3d at 720. We further stated, "We also reject the City's contention that Maguire should have sought a writ of mandamus or injunction to force the City to issue the permit in light of Maguire's contention that section 23–102 did not apply to the proposed drill site." *Id.* at 721.

The City's attempt to limit the applicability of this Court's prior opinion in *Maguire II* is not persuasive. The City argues that *Maguire II* has no bearing on this appeal because that opinion focused on a plea to the jurisdiction, and on an inquiry into whether Maguire's claim was ripe. The City stresses that the current appeal comes to the appellate court after a full trial on the merits, in contrast to the more limited record on appeal from an order granting a plea to the jurisdiction. However, the City identifies no specific or material difference between the evidence proffered in connection with the prior appeal from the grant of a plea to the jurisdiction and the evidence proffered at trial with respect to (1) what actions were undertaken by City employees; (2) the intent to foreclose drilling; and (3) the basis for this intent to foreclose drilling.

There are indeed record differences between the two appeals because the amount of damages was tried following this court's remand in *Maguire II.* Additional testimony and evidence was introduced at trial relating to other issues. But we have been provided with no basis for concluding that the records differ in any material respect regarding the two issues upon which the City now hinges its appeal: (1) unauthorized acts, and (2) intent in connection with enforcement of an ordinance that ultimately was held to be inapplicable. Differences in the record attributable to other issues are not germane.

We therefore reject the City's "unauthorized acts" contention as a basis for arguing that the factors identified in *Penn Central* and *Sheffield* do not apply here. As we have noted above, the City has not challenged the trial court's final judgment or its findings of fact and conclusions of law on grounds that the factors identified in *Penn Central* and *Sheffield* were not established below. Nor has the City challenged the sufficiency of the evidence supporting the factors. Instead, the City has attempted an end-run around those factors; that attempt is unsuccessful for the reasons discussed above.

Because we reject the City's "unauthorized acts" contention as a basis for arguing that the factors identified in *Penn Central* and *Sheffield* are inapplicable in this case, we overrule the City's first issue.

## B. Intent to Take Maguire's Mineral Interests for Public Use

The City's second issue focuses on intent. The City contends, "[T]o recover on an inverse condemnation claim, a plaintiff must establish a governmental entity acted with the intent to invoke its power of eminent domain—*i.e.*, the intent to take, damage, or destroy private property for application to public use." The City further contends that such specific intent is lacking here because the City did not intend to take, damage, or destroy Maguire's well by means of an ordinance that did not apply to Maguire's well site in 1991.

### 1. Is intent required?

To support its premise that intent must be demonstrated, the City relies on cases involving claims for (1) physical damage to private property attributed to improper construction, operation, or approval of public works; and (2) breach of contract by a governmental entity. *See City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005) (flooding damage to property from construction of drainage ditch under plans approved by city); *City of Dallas v. Jennings*, 142 S.W.3d 310, 313–14 (Tex.2004) (flooding from improper operation of sewer line); *Gen. Servs. Comm'n*, 39 S.W.3d at 598–99 (contract dispute); *City of Tyler v. Likes*, 962 S.W.2d 489, 504–05 (Tex.1997) (operation of culvert system caused flood damage to home); *City of Houston v. Renault, Inc.*, 431 S.W.2d 322, 323–24 (Tex. 1968) (operation and construction of public works alleged to have caused flooding); *Kerr v. Tex. Dep't of Transp.*, 45 S.W.3d 248, 252 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (construction in watershed caused flooding); *TRST Corpus, Inc. v. Fin. Ctr., Inc.*, 9 S.W.3d 316, 323 n. 4 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (breach of contract); *Green Int'l, Inc. v. State*, 877 S.W.2d 428, 434 (Tex. App.-Austin 1994, writ dism'd) (breach of contract); *Waddy v. City of Houston*, 834 S.W.2d 97, 102 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (trespass based on presence of sewer line that crossed property).

None of these cases involve intent in the context of an asserted regulatory taking under the factors identified in *Penn Central* and *Sheffield*—much less the intentional but erroneous enforcement of an ordinance against a target who later was determined to be beyond its reach.

We cannot reflexively borrow inverse condemnation precedents from a non-regulatory context and apply them to a dispute arising from an asserted regulatory taking. *See Lowenberg*, 168 S.W.3d at 801–02 ("it is often inappropriate" to treat cases involving a physical taking as controlling precedents for regulatory taking); *see also Koch v. Tex. Gen. Land Office*, 273 S.W.3d 451, 459–60 (Tex.App.-Austin 2008, pet. filed) (concluding that intent standard applicable in "circumstances in which the governmental entity's intentional act is not the actual physical taking or damaging of property" cannot be applied when "the intentional act alleged is the physical taking and dominion over the property at issue;" additionally, "it has not been established that the *Jennings* intent standard applies beyond the context in which it arose."); *City of San Antonio v. El Dorado Amusement Co.*, 195 S.W.3d 238, 244–45 (Tex.App.-San Antonio 2006, pet. denied) ("The longstanding distinction between acquisitions of property for public use and regulations prohibiting private uses makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a regulatory taking.").

The City essentially invites us to approach this dispute as if it were a negligence case in which the negligent act is

reliance by City employees upon an inapplicable statute. From this premise, the City (1) analogizes to cases analyzing specific intent as the difference between negligent and intentional acts in the context of physical takings involving situations such as the operation of a drainage system that results in flood damage to private property; and (2) asserts that it lacked specific intent to accomplish a taking.

We decline the City's invitation to blur the distinction between regulatory and physical takings in this manner, being mindful of the Texas Supreme Court's admonition to exercise care about mechanical application to a regulatory taking situation of precepts from cases addressing physical taking. *See Lowenberg,* 168 S.W.3d at 801–02 (citing *Tahoe–Sierra Pres. Council, Inc.,* 535 U.S. at 323–24, 122 S.Ct. 1465).

In that regard, we note the analysis in *City of San Antonio,* 195 S.W.3d at 244–45. There, the court concluded that physical and regulatory takings cannot necessarily be equated; thus, "intent" discussions from a physical taking context cannot be applied in a regulatory context. *See id.* At the same time, we note *Maguire I's* suggestion that some degree of intent is required in the regulatory taking context. *See Maguire I,* 69 S.W.3d at 358 ("An inverse condemnation may occur when the government . . . unreasonably interferes with the landowner's right to use and enjoy the property, such as by restricting access or denying a permit for development. To maintain a cause of action for inverse condemnation, the plaintiff must prove . . . an intentional governmental act . . . .") (citations omitted).

 We need not and do not decide the extent to which "intent" must be established in a regulatory taking context as distinguished from a physical taking context. Assuming that some level of governmental intent to act must be established in this regulatory context, *see Maguire I,* 69 S.W.3d at 358, any such requirement is satisfied on this record by the demonstrated and unequivocal intent of the City's final decision-maker to enforce the ordinance against Maguire to further the City's goal of protecting Lake Houston. This conduct amounts to an "intentional governmental act" regardless of whether the intentional act rested on an erroneous understanding of the ordinance by the final decision-maker who enforced it. Maguire's rights were no less interfered with because the City's intentional act rested on an erroneous interpretation of its own ordinance.

Such a conclusion comports with the City's contentions in the trial court that (1) "[t]he City's intent in adopting the Ordinance was to prohibit the drilling of oil and gas wells in the area between the 45–foot contour and the 1,000–foot line, whether such land is located in the City or its extraterritorial jurisdiction;" (2) "the City adopted the Ordinance to protect Lake Houston;" and (3) "[t]he Ordinance is inte[n]ded to further the City's interest in protecting its primary water supply, which certainly is at least as substantial an interest as that upheld by the Court in *Mayhew.*" *See also Maguire I,* 69 S.W.3d at 360 (summarizing affidavit establishing that "other than the permit issued to Maguire, the City has not issued a drilling permit for an oil, gas, or mineral well located within 1,000 feet of Lake Houston since 1967").

Such a conclusion also comports with *Maguire I's* rejection of the City's limitations defense. *Maguire I,* 69 S.W.3d at 358–60. The City argued that limitations began running in 1967 when the drilling restriction was enacted. *Id.* at 358. Maguire contended that the statute of limitations did not bar its action because the version of sections 23–101 and 23–102 in

effect in 1991 did not apply to Maguire's well site located within city limits. The Texarkana Court of Appeals rejected the City's limitations argument and noted that "the plain language of the ordinance prohibits drilling only in the City's [extraterritorial jurisdiction]." *Id.* at 360. These circumstances confirm that the operative intentional governmental act was the intentional enforcement of an inapplicable ordinance against Maguire in 1991—not the enactment of an inapplicable ordinance in 1967.

Treating the date of enactment as the operative intentional act may make sense in appropriate circumstances in which the targeted regulatory conduct is the enactment of a prohibition that does in fact apply to limit an otherwise permissible exercise of private property rights. *See Lowenberg,* 168 S.W.3d at 802. Doing so does not make sense when the targeted regulatory conduct is the unwarranted enforcement of a prohibition that does *not* apply but nonetheless is relied upon to thwart an otherwise permissible exercise of private property rights. The City's approach would create a Catch–22. Although the ordinance was expressly invoked to thwart the exercise of private property rights in the name of furthering a substantial governmental interest, there is no remedy for the resulting interference with those rights because the ordinance did not in fact apply to Maguire and did not in fact further a substantial governmental interest with respect to Maguire's activities. We cannot endorse this anomalous result.

■ This court has recognized that a viable inverse condemnation claim can be predicated on the City's intentional but erroneous enforcement of an ordinance that interferes with permissible activity by the targeted entity. *City of Houston v. De Trapani,* 771 S.W.2d 703 (Tex.App.-Houston [14th Dist.] 1989, writ denied), *abrogated on other grounds by Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 444–46 (Tex.1994). In *De Trapani,* the City of Houston enacted regulations applicable to billboards and gave billboard owners notice of the deadline for removal. *Id.* at 704. The owners removed their billboards in reliance on the City's mistaken reading of the ordinance, only to learn of the City's error after the deadline for erecting new billboards; this resulted in a loss of the owners' business. *Id.* The owners and the City agreed that the City's original interpretation of the ordinance was erroneous. *Id.* The owners sought compensatory relief under 42 U.S.C. § 1983 and declaratory relief pursuant to chapter 37 of the Texas Civil Practice and Remedies Code. *Id.* A jury concluded that the City had effected an unconstitutional taking of property and awarded the owners $500,000 in damages. *Id.*

On appeal, the City contested "liability under 42 U.S.C. § 1983 on the ground that no one ever executed official policy against the plaintiffs." *Id.* at 705. In that regard, the City argued that the final authority to make policy resides exclusively in the City Council, and that the sign administrator's decisions were not attributable to the municipality. *Id.* This court rejected the City's argument and acknowledged that section 1983 exists to remedy the violation of a constitutional right. *See id.* at 707–08. Recognition of a viable section 1983 action necessarily acknowledges a viable claim for the vindication of an underlying constitutional right—in *De Trapani,* that right was to not have property rights taken without compensation. *See id.* *De Trapani* supports the result here because it recognizes that the intentional but erroneous enforcement of an ordinance based upon the City's mistaken interpretation can give rise to an inverse condemnation claim.

## 2. Whose intent matters?

The City also reprises its contention—rejected in *Maguire II* and again in this appeal—regarding the identity of the actor who must possess the requisite intent.

The City contends that "the City acts only through its City Council." The City contends that the City Council's only relevant action was enacting the ordinance, which did not apply to Maguire in 1991. Therefore, the City asserts that it had no intent to impair Maguire's mineral interests.

This is a revised formulation of the already-rejected contention that City employees were not final decision-makers, and that an appeal to the City Council was required. We have rejected a contention that the City acts only through its council. *Maguire II*, 243 S.W.3d at 719–20. We concluded, "[T]he director is the only person with authority to grant a drilling permit," and the director "is the relevant decision maker." *Id.* at 719. Our prior opinion squarely states: "The City Council is not the [r]elevant [d]ecision [m]aker." *Id.*

We further stated, "In [the] context of an inverse condemnation case, the matter is not ripe unless the governmental entity charged with implementing the regulation that allegedly caused the taking has reached a final decision." *Id.* at 718 (citations omitted). "A final decision is prerequisite to ripeness in the context of regulatory takings and related constitutional claims." *Id.* (citing *Mayhew*, 964 S.W.2d at 929). "That final and authoritative decision must be 'of the type and intensity of development legally permitted on the subject property [because a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.' " *Id.* (citing *Mayhew*, 964 S.W.2d at 929). *Maguire II* held that "Maguire received a final administrative decision." *Id.* at 720.

If the decision at issue is final and authoritative enough to allow a determination about how far the regulation goes, then it is final and authoritative enough to be the City's decision.

## 3. Is there evidence of intent?

The City also relies on the trial court's finding of fact number nine, which recites that Alexander and Kristaponis "did not intend to prohibit the recovery of any minerals or otherwise take Appellees' mineral interests." This reliance is misplaced because there is no evidence to support the trial court's finding of fact number nine regarding the asserted intent of Alexander and Kristaponis not to commit a taking.[9]

The City asserts that "Mr. Alexander and Ms. Kristaponis intended only to protect Lake Houston by prohibiting Appellees from drilling on a surface site just 300 feet from the lake—a location they believed to be subject to the 1,000' Prohibition. In doing so, they specifically did not intend to prohibit the recovery of any minerals or otherwise take Appellees' mineral interests." There is no evidence to sup-

---

9. In its brief, Maguire challenged the trial court's finding of fact number nine. In its reply brief, the City argued that Maguire had waived any challenge to the trial court's findings of fact; the City did not point to any evidence supporting finding of fact number nine. We reject the City's contention that a sufficiency challenge to finding of fact nine should not be considered because it has been waived. Maguire adequately challenged the evidence supporting finding of fact nine in footnote 26 of its brief. In any event, this Court is not bound by a finding of fact for which there is no evidentiary support even when that finding is unchallenged on appeal. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986).

port the City's assertion regarding intent to prohibit recovery of minerals. The evidence adduced at trial contradicts the City's assertion that there was no intent to prohibit the recovery of minerals by Maguire.

Kristaponis did not testify live or by deposition at trial. She signed a letter that appears as Plaintiff's Exhibit 41. This letter says nothing about her intent or the City's intent not to commit a taking. It recites her erroneous understanding of the ordinance and asserts that the ordinance is applicable to Maguire's permit for its Wheless No. 1 well when, in fact, it was not applicable.

Alexander testified by deposition at trial. His deposition testimony says nothing about an intent not to commit a taking. Alexander testified that a Lake Houston patrol contacted him after noticing Maguire's drilling site in October 1991. Alexander inspected the drilling site and informed his supervisor, Aghedo, about the drilling site location. Alexander testified that Deputy Assistant Director Hulbert instructed him to issue a stop work order, and Alexander issued the stop work order on October 31, 1991. Later, Alexander delivered Kristaponis's letter notifying Maguire that its drilling permit had been revoked. The stop work order and letter say nothing about the intent of Alexander, Kristaponis, or the City not to commit a taking.

The City, acting through Deputy Assistant Director Hulbert, intended to stop Maguire from drilling regardless of whether a permit had been issued, and it had no intention of allowing Maguire to drill.

At trial, Hulbert testified by deposition as follows:

Q.: Was it important to you whether or not Maguire Oil Company had a drilling permit for that location?

A.: The thing that was important to me is that they were getting ready to drill, and I knew that if they had a permit, that it was done in error by somebody.

Q.: So it didn't make any difference to you, as far as you were concerned?

A.: Not really. I knew that we had to stop it.

\* \* \*

Q.: Talking specifically at the [November] meeting with Mr. Vendig and representatives from Maguire Oil Company, did you tell Maguire and their representatives that your department would not agree to any type of exception, procedure or modification of the ordinance that would allow the drilling of the well [at] the location that Maguire had selected?

A.: I did.

\* \* \*

Q.: In fact, one of the discussions that was discussed at the meeting in November of 1991 with representatives of Maguire was the possibility of Maguire seeking an amendment or an exception to the ordinance.

A.: Yes.

Q.: Do you recall if that was discussed?

A.: Yes, sir.

Q.: Did any of the representatives of the City at that meeting indicate they would support or agree to put forth such a proposal?

A.: No.

Q.: In fact, they rejected any type of proposal to amend or change the ordinance?

A.: That's correct.

\* \* \*

Q.: To the best of your knowledge has there ever been any ordinance authorizing the City of Houston to allow a well—

I'm sorry, to allow an exception to Section 23–102?

A.: Not to my knowledge.

* * *

Q.: What is your opinion as to how far a well would have to be from the shore of Lake Houston before it would be a reasonable risk to drill?

A.: I really—my answer would be I can't quantify the distance.

Q.: Could it be a mile or more? Five hundred? 5,000 yards?

A.: 5,000 miles would be better in my opinion.

We also consider Maguire's memoranda and meeting notes of November 6, 1991 and December 18, 1991.

These notes describe a meeting with City officials and confirm that the City was adamantly and irrevocably opposed to drilling within 1,000 feet of Lake Houston due to pollution concerns.

November 6, 1991 Maguire memorandum and notes excerpts:

[Maguire representatives] met with the following City of Houston personnel:

| | |
|---|---|
| Paul Bibler | Legal Department |
| Roger W. Hulbert | Deputy Asst. Director of Public Utilities in Charge of Water Quality Control |
| John Halet | Health Department |
| Hal Caton | Planning and Development Department |

* * *

[Maguire representative] tried to point out that various things that could be done on the surface and tried to prod them to tell us what their concerns were so that we could attempt to address those concerns.

John Halet, with the Health Department, simply stated that his boss was absolutely opposed to the drilling of the well in the location proposed and would never support it in front of the City Council.

Roger Hulbert indicated that their main concern was pollution; that there evidently was continuing seepage of salt water into the lake, probably from old abandoned wells; and, that unless there were guarantees that, even under a catastrophic circumstance such as a blowout, pollutants would never enter the lake he would never support the change in the ordinance.

[Maguire representatives] tried to point out that the ordinance was poorly written in that it didn't have any procedures for exceptions such as most ordinances do. Roger [Hulbert] stated that he felt it was written that way on purpose; that is, they did not ever want any drilling within 1,000 feet.

* * *

December 18, 1991 Maguire memorandum and notes excerpts:

We wanted to discuss with the City of Houston additional safe guards that they might want to see in place, but were unable to do so because of their blanket approach that nothing would be drilled within 1000 feet of the lake.

Further, Water Quality Control Senior Inspector Aghedo testified by deposition at trial that there is no provision for an exception or variance of the 1,000 feet requirement in the ordinance. Finally, Planning and Development Senior Inspector Belveal testified by deposition at trial that he did not know that ordinance section 23–102 existed until October 1991. Belveal testified that his supervisor, Hal Caton, informed him that Maguire's drilling permit had been revoked because the well would be drilled too close to Lake Houston.

Contrary to the City's contention on appeal, the evidence outlined above reflects the City's intent to prohibit the recovery of minerals by Maguire. The ordinance's inapplicability to Maguire's drilling site supports the conclusion that the City's interference was unreasonable; the ordinance's inapplicability does *not* establish the absence of interference, the absence of intent to prohibit recovery of minerals by Maguire, or the absence of intent to commit a taking through enforcement of the ordinance. Thus, there is evidence that the City effected a taking when it intentionally and unreasonably interfered with Maguire's right to use and enjoy its mineral estate.

We overrule the City's second issue.[10]

### III. Maguire's Cross–Appeal

Maguire challenges the trial court's award of court costs in its cross-appeal.

In the trial court, Maguire filed a bill of costs after the trial court signed its judgment asking the court clerk to tax deposition fees as well as service fees, costs of certified copies, filing fees, and copy costs for a total of $47,267.80. The City filed its objection to Maguire's bill of costs on June 19, 2009. The City asserted that Maguire's proposed bill of costs "includes such items as (i) depositions in another matter still pending in the 55th District Court between the parties, (ii) filing fees in appellate matters that are not part of this proceeding and (iii) copying costs totaling $32,000." The City attached "a copy of the Bill of Costs prepared for this case by the Harris County Clerk, totaling $11,289.04." The City asked the trial court to "adjudge costs in the amount of $11,289.04 in accordance with the Harris County Clerk's Bill of Cost" because Maguire's proposed bill

of costs is "outside the taxable costs allowed by law." The court signed its order on July 24, 2009 awarding Maguire $9,144.30 in court costs.

In two issues, Maguire argues on cross-appeal that the trial court erred by denying recovery of (1) "court reporter fees incurred for use in the suit, but prior to the time the case was filed in County Court at Law No. 4;" and (2) "photocopy costs when the photocopies were demanded by the City or required by court order."

Texas statutes and rules delineate which items the court may and may not include as taxable costs. *See Hatfield v. Solomon,* 316 S.W.3d 50, 66 (Tex.App.-Houston [14th Dist.] 2010, no pet.); *Gumpert v. ABF Freight Sys., Inc.,* 312 S.W.3d 237, 239 (Tex.App.-Dallas 2010, no pet.) ("The general rule in Texas is that expenses incurred in prosecuting or defending a suit are not recoverable as costs unless recovery for those items is expressly provided for by statute, rule, or under principles of equity."). Rule 131 provides that "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except when otherwise provided." Tex.R. Civ. P. 131.

The term "costs" has a particular meaning in this context. "Costs" usually encompass fees and charges required by law to be paid to the courts or some of their officers, the amount of which is fixed by statute or the court's rules; examples include filing and service fees. *Hatfield,* 316 S.W.3d at 66. Costs within the meaning of Rules 125 through 149 are those items in the clerk's bill of costs. *Id.; see also* Tex.R. Civ. P. 125–49. Whether a particular expense is recoverable under statute or rule as court costs is a question

10. In light of our disposition, we need not address Maguire's contention that the trial court's takings finding can be affirmed based

on other takings theories asserted in the trial court.

of law, which is reviewed *de novo.* *Gumpert,* 312 S.W.3d at 239. The allocation of costs is a matter for the trial court's discretion and cannot be overturned on appeal absent an abuse of discretion. *Hatfield,* 316 S.W.3d at 66–67; *Gumpert,* 312 S.W.3d at 239.

Under Rule 141, the trial court has discretion, for good cause stated on the record, to allocate costs in a manner other than as provided by law or the Texas Rules of Civil Procedure. *See* Tex.R. Civ. P. 141. Therefore, the trial court has the power to tax costs contrary to the applicable default rule—for example, to a party who is not the "successful party" under Rule 131. *Hatfield,* 316 S.W.3d at 67. However, this power to allocate costs in a manner different from the norm does not encompass the power to tax as "costs" items that are not normally allowed as taxable court costs. *Id.* Generally, expenses incurred in prosecuting or defending a lawsuit are not recoverable as costs in Texas, unless permitted by a statute or equitable principle. *Id.* Under the Texas Civil Practice and Remedies Code, a party may recover fees of the clerk and service fees due to the county; court reporter fees for the original of stenographic transcripts; and such other costs and fees permitted to be awarded by other rules and statutes. *See* Tex. Civ. Prac. & Rem.Code Ann. § 31.007(b) (Vernon 2008).

## A. Court Reporter Fees for Stenographic Transcripts

■ Maguire argues that it is entitled to recover approximately $3,000 in additional court reporter fees it incurred for certain deposition transcripts. The City contends that these excluded court reporter fees arise from depositions that do not pertain to the inverse condemnation claim tried in the County Civil Court at Law Number Four. According to the City,

these fees and depositions relate to other claims that remained in the 55th District Court after Maguire dismissed the inverse condemnation claim and re-filed it in the County Civil Court at Law Number Four. Maguire responds that two agreed orders establish that "all depositions and written discovery taken in the 55th District Court would be treated as if they were taken in the county court at law;" therefore, according to Maguire, the trial court should have awarded to Maguire as "costs" the fees incurred for these depositions.

As a threshold matter, we note the City's waiver argument. The City contends that "[t]he Costs Order reflects that the trial court considered evidence at a hearing on Maguire's motion for an award of court costs." The City argues that "[i]f the trial court considered evidence, the failure to file a Reporter's Record containing that evidence requires this Court to presume that the trial court's proceedings support the Costs Order." According to the City, Maguire waived any trial court error by failing to file a reporter's record of the hearing. The City also argues that Maguire failed to (1) correlate the disputed deposition court reporter fees to the inverse condemnation claim; and (2) "present evidence showing any deposition officer's certification for any depositions as required by Rule 203.2 of the Texas Rules of Civil Procedure."

We reject the City's waiver argument because we do not need a hearing transcript to decide whether the agreed orders apply here. We note that the City did not complain in the trial court that "Maguire did not present evidence showing any deposition officer's certification for any depositions as required by Rule 203.2." It may not raise its complaint now for the first time on appeal.

We also reject the City's contention that Maguire cannot recover the disputed court

reporter fees because they relate to depositions taken in connection with other claims remaining in the 55th District Court. The January 11, 2005 and the October 2, 2008 agreed orders were signed by the trial court and the City's counsel. They provide in pertinent part: "All written discovery and oral depositions conducted in the case ... in the 55th Judicial District Court of Harris County Texas shall have the full force and effect as if conducted in this proceeding." That "full force and effect" encompasses the effect of awarding court reporter's fees for purposes of the award of costs in the inverse condemnation claim tried in County Civil Court at Law Number Four.

The agreed orders do not differentiate between deposition transcripts pertaining to Maguire's inverse condemnation claim in County Civil Court at Law Number Four and deposition transcripts pertaining to remaining claims in the 55th District Court. "[F]ull force and effect" relates to all depositions; nothing in the orders excludes other claims, if any, or limits the "full force and effect" language to depositions pertaining specifically to Maguire's inverse condemnation claim.

We conclude that Maguire was entitled to recover court reporter fees it incurred for deposition transcripts in the County Civil Court at Law Number Four and in the 55th District Court as submitted in its bill of costs. The trial court's failure to award these fees is an abuse of discretion. We sustain Maguire's first issue on cross-appeal.

### B. Photocopy Expenses

In its second issue, Maguire contends that the trial court erred by denying recovery as court "costs" of $32,059.92 in photocopy expenses associated with the production of documents requested by the City. Maguire argues that it can recover these photocopy expenses as "costs" under Civil Practice and Remedies Code section 31.007(b)(4) and Texas Civil Procedure Rule 196.6.

Without deciding whether the expense of responding to discovery can be treated as court "costs" for purposes of a bill of costs, we reject Maguire's contention. Assuming that such expenses can be characterized in this manner, Maguire's bill of costs did not establish that its photocopy expenses were attributable to responding to document requests from the City as opposed to general copy costs in litigation. Therefore, the trial court did not abuse its discretion in denying recovery of those expenses as court "costs" under the provisions invoked by Maguire.

Accordingly, we overrule Maguire's second issue on cross-appeal.

### Conclusion

We overrule the City's issues and affirm the trial court's final judgment. We sustain Maguire's first issue on cross-appeal and modify the trial court's order on court costs to include the additional deposition fees incurred by Maguire as set out in its bill of costs. We overrule Maguire's second issue on cross-appeal. We affirm the trial court's order on award of court costs as modified.